# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) | REBECCA ROYSTON, | |
| | Plaintiff, | |
| v. | | CASE NO.: 19-cv-274-RAW |
| (2) | JOHNNY CHRISTIAN, his is official and individual capacity, | |
| (3) | TURN KEY HEALTH CLINICS, LLC, | |
| (4) | LISA PLATFOOT, in her individual capacity, | |
| (5) | KRISTI TOOMBS, in her official and individual capacity, | |
| (6) | ROY PRENTICE, in his individual capacity, | |
| (7) | BONNIE MURRAY, in her individual capacity, | |
| (8) | MARIE PEDEN, in her individual capacity, | |
| (9) | DENA NATIONS, in her individual capacity, | |
| (10) | ANDREW JOHNSON, in his individual capacity, | |
| (11) | BRIAN FOWLKES, in his individual capacity, | |
| (12) | STEVE NABORS, in his individual capacity, | |
| | Defendants. | |

# AMENDED COMPLAINT

Plaintiff, Rebecca Royston, ("ROYSTON") for her cause of action against the above-named Defendants, would state as follows:

## I.

### PARTIES, JURISDICTION, VENUE

1. ROYSTON is a resident and citizen of the State of Oklahoma.

2. Johnny Christian ("CHRISTIAN"), is the elected Sheriff of Bryan County, Oklahoma. CHRISTIAN is the final policy-maker for training and the operational aspects of the Bryan County Detention Center ("BCDC") and the implementation of all BCDC policies. As the Sheriff of Bryan County, CHRISTIAN owed a non-delegable duty to provide all persons detained at the BCDC with adequate medical care. At all times relevant hereto, CHRISTIAN was acting as the sheriff of Bryan County. He is sued in his official and individual capacities.

3. Kristi Toombs (Toombs), Brian Fowlkes (Fowlkes), and Steve Nabors (Nabors) are or were employees for the Bryan County Sheriff's Office (BCSO) with supervisory responsibility for the BCDC. Fowlkes and Nabors are sued in their individual capacities. Toombs is sued in her individual capacity and in her official capacity as an authorized decisionmaker at the BCDC.

4. Roy Prentice (Prentice), Bonnie Murray (Murray), Marie Peden (Peden), Dena Nations (Nations), and Andrew Johnson (Johnson), are or were employees of the BCSO and working at the BCDC during Rebecca's detention on August 20, 107. They are sued in their individual capacities.

5. Turn Key Health Clinics, LLC, ("TURN KEY") is a domestic for-profit limited liability company. TURN KEY was the correctional medical contractor at the BCDC in August 2017. The applicable medical services contract between Turn Key and Bryan County explicitly

2

characterizes Turn Key as an "independent contractor." Lisa Platfoot ("PLATFOOT") is or was an agent or employee of TURN KEY on August 201, 2017. Plaintiff served Turn Key with a Title 57 notice on November 15, 2017. Turn Key did not respond to the notice and this litigation was initiated on August 13, 2018.

6. The events complained of below occurred in Bryan County, Oklahoma, which is within the territorial jurisdiction of this Court. This court has subject-matter jurisdiction based on the existence of federal questions.

## II.

### STATEMENT OF FACTS

7. Records indicated that in the early morning hours of August 20, 2017, ROYSTON's husband placed a call to 911 seeking medical assistance for his wife.

8. Records indicate that deputies from the Bryan County Sheriff's Office ("BCSO") responded to the call and arrived before the EMTs.

9. Records indicate that the deputies were told that ROYSTON was off her medication for bi-polar disorder. Records indicate the deputies also suspected that ROYSTON was under the influence.

10. Records indicate the deputies observed that ROYSTON was naked and being held down by her husband who was trying to prevent her from leaving the property.

11. Records indicate the deputies placed ROYSTON in handcuffs before the medics arrived because she was kicking and jerking her arms.

12. Records indicate that responding medics noted that ROYSTON had no obvious injuries, but that she was dirty and rolling on the ground.

13. Records indicate that the deputies also observed that ROYSTON was randomly asking questions that did not pertain to the situation.

14. Records indicate that the deputies and medics were prepared to transport ROYSTON for higher level care, but they repeatedly deferred to ROYSTON's decision-making.

15. Records indicate the deputies then transported ROYSTON to the BCDC where she was placed in a suicide smock before exiting the vehicle.

16. Records indicate that ROYSTON was processed into the BCDC on August 20, 2017 at approximately 2:24 a.m. by Prentice. Records indicate that she was charged with indecent exposure, disturbance of the peace, and public intoxication. There is no evidence that Prentice assessed Rebecca as required for admission by the Oklahoma Jail Standards. *See* Okla. Admin. Code, 310:670-5-8(2).

17. Records indicate that once in the BCDC, deputies observed that ROYSTON was uneasy on her feet, and had a hard time keeping her balance.

18. Section 1.1 of the Medical Services Contract between the BCSO and TURN KEY provides that TURN KEY is "responsible for all medical care for all inmates at the Facility" which "commences with the commitment of the inmate to the custody of the Facility and ends with the release of the inmate."

19. Upon information and belief, TURN KEY did not have a medical provider at the BCDC to provide any medical assessment or medical care for ROYSTON at the time she was booked into the BCDC on August 20, 2017. Upon information and belief, the absence of an employee with medical training to conduct the intake medical screening at this time of night was common practice at the BCDC.

20. ROYSTON's Booking Summary includes the notation "HIGHLY INTOXICATED".

21. The BSCO Arresting Officer Information Sheet includes the following question and response: "*Has Prisoner Ingested Large Quantities of Alcohol/Drugs?*" "*No.*"

22. Section 1.17(3) of the Medical Services Contract between the BCSO and TURN KEY required TURN KEY to "review all intake screenings performed by detention staff for inmates upon admission to the facility," but the contract only required Turn Key to provide "up to 42 hours a week of on-site Medical Personnel (RN, LPN, MA) coverage." *See* Section 1.17(2)(a).

23. Based on the terms of the Medial Services Contract, the BCSO and CHRISTIAN would know that TURN KEY was not required to provide any on site medical coverage for the remaining 126 hours during the week.

24. The Medical Services Contract also required TURN KEY to provide 24 hour on-call coverage by a physician or midlevel provider, but there is no indication from ROYSTON's records that BCSO attempted to contact a provider at the time of admission, and there is no indication that TURN KEY made a responsive provider available during ROYSTON's admission for BSCO to contact.

25. At the time of ROYSTON's intake, the Oklahoma Jail Standards also required a "Medical/mental health screening by trained facility personnel utilizing a questionnaire approved by the Department of Health, or a screening conducted by a physician or other licensed medical personnel." *See* O.A.C. 310:670-5-1(1)(C).

26. There is no indication from records provided by the BSCO that TURN KEY, or anyone affiliated with the BCSO, completed a medical intake screening for ROYSTON at any time during her detention on August 20, 2017.

27. At 6:28 a.m., Johnson, Peden, Prentice, and Brauer entered the isolation cell, hog-tied Royston, and left. The hog-tie was not proceeded by a medical assessment, and the jailers did nothing to determine whether it was safe to hog-tie a person in Royston's condition and leave them unattended. Nations also observed Rebecca's condition but took no action.

28. Between 6:28 a.m. and 6:45 a.m., Johnson, Peden, Prentice and Brauer believed that Royston was striking her head on against the concrete in the isolation cell. Upon information and belief, Nations would have seen or known about the head strikes based on her position based on her remote observations of Rebecca from the control room, and from encounters with the other jailers.

29. Despite believing that Royston shad suffered a head strike against the concrete, none of the jailers attempted to assess Royston for a head injury, determine whether she sustained a head injury, or called for a medical assessment.

30. Instead, at 6:45 a.m., Johnson, Pedan, Prentice and Murray entered the isolation cell and put Rebecca in a football helmet so she wouldn't strike her head again while still in the hog-tie. Upon information and belief, Nations knew the jailers had placed Rebecca in a hog-tie and the football helmet, but took no action.

31. At 7:30 a.m., jailers notified Bryan County supervisory staff of Rebecca's booking. BCDC supervisors Fowlkes and Nabors instructed staff to place Rebecca on 15 minute checks; they did not require that anyone call medical, perform an intake, or physically assess Rebecca, who remained hog-tied in a football helmet.

32. At 8:15 a.m., jailers removed the hog-tie and helmet, but no assessment was performed and none of the jailers called medical.

33. At 9:45 a.m.—approximately 7.5 hours after ROYSTON had arrived, PLATFOOT, created a Progress Note with the following information:

    a) Patient is currently in isolation cell for protection due to high intoxication;

    b) Unable to obtain vital signs;

    c) Unable to communicate with patient;

    d) Occasionally eyes open and roll back;

    e) Patient is on 15 minute checks per security;

    f) Mental health has been notified;

    g) EMS was at scene prior to booking, unable to provide care per deputy.

34. PLATFOOT'S progress note made no reference to any screening or assessment by herself or any other medical provider or trained facility personnel, it does not identify any effort to contact a physician or midlevel provider, it does not describe any care provided by a mental health provider, registered nurse, or physician, and there is no outside referral for care by anyone else.

35. Section 1.17(3) of the Medical Services Contract between the BCSO and TURN KEY required TURN KEY to provide coverage by a Mental Health Professional through an on-site clinic or tele-health services up to 3 hours each week.

36. Based on the terms of the Medial Services Contract, the BCSO and CHRISTIAN would know that TURN KEY was not required to provide any on site coverage for the remaining 165 hours during the week.

7

37. There is no indication from the records provided by the BCSO that any mental health professional responded to the notice memorialized in the progress note created at 9:45 a.m., and there is no indication that TURN KEY or BCSO made any arrangements to provide ROYSTON with care from any mental health professional.

38. There is no evidence Platfoot or anyone else called mental health or assessed ROYSTON, and there is no evidence jailers were performing 15 minute sight checks, and despite acknowledging that no one had vital signs on Rebecca, and knowing that Rebecca was highly intoxicated and could not communicate herself, and further charting bodily injuries and an obvious need for care, Platfoot did nothing.

39. Platfoot never entered the cell to physically assess Rebecca, she never called for a higher level provider, and she did not assess or monitor Rebecca despite acknowledging that she would. Platfoot left Rebecca to languish with a head injury and did nothing as her condition worsened.

40. From 9:45 a.m. until 1:30 p.m., Nations and Johnson observed Rebecca on the floor of the cell. Rebecca was rolling on the ground in obvious need of emergent medical care, but Nations and Johnson did nothing. There is no evidence any jailer or medical provider entered the cell and performed any assessment whatsoever. No vitals were taken and Nations and Johnson were content to allow Rebecca's condition to continue deteriorating, which it did in fact.

41. At 1:30 p.m., Toombs allegedly instructed Johnson to obtain a mental health consult for Rebecca and transport her to the hospital.

42. At 2:30 p.m., PLATFOOT created a second progress note indicating that ROYSTON was sent to the hospital for medical clearance from a mental health facility "per security".

43. The second progress note makes no reference to any head injury, or any care provided by a mental health provider, registered nurse, or physician.

44. The second progress note does not detail any intervening care, treatment, or observations by any medical provider, mental health or otherwise.

45. Almost an hour later, at 3:23 p.m., the physician documentation from the emergency department at the hospital indicates that ROYSTON "present[ed] to [the] ER via Law Enforcement" with "altered mental status" "confusion" "decreased mental status" and "decreased responsiveness."

46. The hospital records indicate the onset of symptoms was "unknown" and that ROYSTON's "last known well witnessed" was "greater than 2 hours" of her arrival at the emergency room.

47. Hospital records indicate that one or more transporting deputies informed hospital staff that "Once [ROYSTON] was detained, she became combative, so they handcuffed her and put her in the cell" and that "[ROYSTON] banged her head against the concrete wall several times last night but since this morning she has pretty much just laid still unless someone touched her or tried to move her then she would become very combative."

48. The hospital records indicate that "ROYSTON arrive[sic] in handcuffs and shackles" and that responding EMS "picked her up out of the floor of the jail cell."

49. The hospital providers noted that the severity of her condition prevented ROYSTON from contributing information.

50. The conditions noted in the hospital records include observations that ROYSTON "appears obviously ill" that "she is very hot to the touch" that she has multiple bruises over

entire body, including her head, moderate ecchymosis to the head/face, forehead, right and left temples, eyes, neck, chest, abdomen, back.

51. The hospital records recorded a Glasgow Coma Score of 6 at the time of admission, which is indicative of a severe brain injury.

52. Hospital records show a CT scan was ordered at 3:32 p.m. and an endotracheal tube was inserted.

53. The radiology results for the CT identified blood in the subarachnoid space, additional blood in the right cerebellum, cerebral edema, a midline-shift right to left between 2.5 to 3 mm, and an acute subdural hematoma over the right frontal lobe.

54. At 6:46 p.m., hospital records indicate that ROYSTON was transferred by air ambulance to Medical City in Plano, TX where she remained in a coma for several days.

55. Hospital records from Texas indicate that ROYSTON was left unattended at the BCDC in excess of 10 hours.

56. ROYSTON was not medically cleared before she was booked into the BCDC, and upon information and belief, this was consistent with the practice at the BCDC adopted, enforced, and maintained by Christian, Toombs, Fowlkes, and/or Nabors.

57. ROYSTON was never assessed by a mental health professional at the BCDC, and upon information and belief, this was consistent with the practice at the BCDC adopted, enforced, and maintained by Christian, Toombs, Fowlkes, and/or Nabors.

58. ROYSTON was never assessed by a physician at the BCDC, and upon information and belief, this was consistent with the practice at the BCDC, adopted, enforced, and maintained by Christian, Toombs, Fowlkes, and/or Nabors.

59. ROYSTON was never assessed by a registered nurse at the BCDC, and upon information and belief, this was consistent with the practice at the BCDC, adopted, enforced, and maintained by Christian, Toombs, Fowlkes, and/or Nabors.

60. Consistent with practice, the BCSO did not report ROYSTON's transfer for outside medical care to the Oklahoma State Department of Health Jail Inspection Division.

61. The BCSO did not conduct timely welfare checks on ROYSTON as required by the Oklahoma Jail Standards.

62. The BCSO and TURN KEY did not provide any care to ROYSTON despite knowledge that her conditioned worsened after hitting her head against a concrete wall.

63. The BCSO and TURN KEY did nothing for ROYSTON despite obvious injuries all over her body.

64. The BCSO and TURN KEY did nothing for ROYSTON despite her obvious need for medical care even prior to BCSO deputies presenting her for booking.

65. Upon information and belief, no BCSO or TURN KEY employee was disciplined in relation to ROYSTON's detention.

66. Upon information and belief, the lack of discipline by the Sheriff or TURN KEY, and the lack of any effort to penalize TURN KEY, evinces CHRISTIAN's approval of the manner in which BCSO employees and TURN KEY disregarded ROYSTON's medical needs through policies, practices, customs, or usages. Alternatively, or in addition to the indifference by Christian, the lack of discipline reflects indifference by Toombs, Fowlkes, and/or Nabors towards policies and practices that expose inmates to a substantial risk of serious harm.

67. ROYSTON suffered from a serious medical condition at the time of booking and throughout her detention.

68. ROYSTON's need for medical care would have been obvious to anyone who encountered her, and it was obvious in fact to the deputies and EMTs who recognized her need for medical care.

69. Despite the seriousness of ROYSTON's condition, and despite her obvious need for medical care, Defendants failed to take steps to provide adequate care, and that failure directly resulted in ROYSTON's injuries, prolonged pain, permanent injury, and a worsening of her condition.

70. CHRISTIAN and/or Toombs implemented a written policy or unwritten practice, or acquiesced in its use, to admit arrestees to the BCDC without providing an adequate medical screening. The use of this policy or practice increased the substantial risk of serious harm to arrestees like ROYSTON who were medically compromised when presented to the facility for admission.

71. CHRISTIAN and/or Toombs implemented a written policy or unwritten practice, or acquiesced in its use, to classify arrestees for housing at the BCDC without providing an adequate risk assessment for the arrestee. The use of this policy or practice increased the substantial risk of serious harm to arrestees like ROYSTON who were medically compromised when presented for admission to the facility.

72. CHRISTIAN and/or Toombs implemented a written policy or unwritten practice, or acquiesced in its use, to provide medical care at the BCDC through a medical services contractor despite knowledge the contractor was only required to provide care for a limited number of hours each week. The use of this policy or practice increased the substantial risk of serious harm to arrestees like ROYSTON who were medically compromised when presented for admission to the facility during times that were not covered by the Medical Services Contract.

73. CHRISTIAN and/or Toombs implemented a written policy or unwritten practice, or acquiesced in its use, to conduct intake assessments of arrestees using jailers who were not adequately trained to evaluate the medical needs of those presented for admission. The use of this policy or practice increased the substantial risk of serious harm to arrestees like ROYSTON who were medically compromised when presented for admission to the facility during times that were not covered by the Medical Services Contract.

74. CHRISTIAN and/or Toombs implemented a written policy or unwritten practice, or acquiesced in its use, to delay the transport of arrestees in need to medical care to outside facilities. The use of this policy or practice increased the substantial risk of serious harm to arrestees like ROYSTON who were medically compromised when presented for admission to the facility, and whose conditions worsened by the delay in providing care.

75. CHRISTIAN and/or Toombs implemented a written policy or unwritten practice, or acquiesced in its use, to delay or deny adequate mental health assessments to arrestees presented for admission. The use of this policy or practice increased the substantial risk of serious harm to arrestees like ROYSTON who were medically compromised when presented for admission to the facility, and who suffered from known mental health conditions, like bi-polar disorder.

76. CHRISTIAN and/or Toombs implemented a written policy or unwritten practice, or acquiesced in its use, to violate the Oklahoma Jail Standards by failing to notify the Oklahoma State Department of Health Jail Inspection Division of instances where a serious medical condition required transport of an inmate to an outside facility for medical care. The use of this policy or practice increased the substantial risk of serious harm to arrestees like ROYSTON who

were exposed to unconstitutional conditions of confinement as a consequence of inadequate supervision and monitoring over jail operations.

77. CHRISTIAN and/or Toombs and TURN KEY implemented a written policy or unwritten practice, or acquiesced in its use to withhold adequate supervision of inmates who presented with objectively serious medical conditions that required a closer assessment than spot checking from a door, camera, or window. The use of this policy or practice increased the substantial risk of serious harm to arrestees like ROYSTON who were exposed to unconstitutional conditions of confinement as a consequence of inadequate supervision and monitoring over jail operations.

78. TURN KEY implemented a written policy or unwritten practice, or acquiesced in its use, of contracting to provide BOARD and CHRISTIAN with access to medical and mental health providers during times when there was no provider at the BCDC. However, upon information and belief, TURN KEY failed to satisfy that contractual obligation despite knowledge that its failure to make a provider available would predictably deny or delay the provision of adequate medical care for inmates at the BCDC with emergent medical or mental health conditions.

79. TURN KEY implemented a written policy or unwritten practice, or acquiesced in its use, of failing to train the persons used to staff its contracts on the constitutional obligations and duties owed to arrestees under their care and supervision. The use of this policy or practice increased the substantial risk of serious harm to arrestees like ROYSTON who were exposed to unconstitutional conditions of confinement as a consequence of inadequate training necessary to understand the constitutional duties and obligations.

80.     CHRISTIAN and/or Toombs implemented a written policy or unwritten practice, or acquiesced in its use, of failing to adequately train BSCO employees to assess and monitor arrestee presenting with serious medical conditions despite knowledge that the contract with Turn Key did not provide comprehensive on-site coverage, and despite ensuring that Turn Key was satisfying the contract obligation to make providers available by remote means at times when no coverage was provided at the facility.  The use of this policy or practice increased the substantial risk of serious harm to arrestees like ROYSTON who were exposed to unconstitutional conditions of confinement as a consequence of inadequate training necessary to understand and respond to the serious medical conditions that required emergent medical care.

### III.

#### STATEMENT OF CLAIMS

#### FIRST CLAIM

**CONDITIONS OF CONFINEMENT**
**UNLAWFUL POLICY OR CUSTOM**
**DELIBERATE INDIFFERENCE**
**42 U.S.C. § 1983**

81.     Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

82.     Based upon the facts set forth above, ROYSTON contends that Defendant CHRISTIAN and/or Toombs, in their individual and official capacity, through written policy or unwritten practice authorizing the conduct above, deprived ROYSTON of the right to be free from dangerous conditions of confinement, as secured by the Fourteenth Amendment to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983, for which CHRISTIAN

15

and/or Toombs are liable in their official and individual capacities, through implementation of unlawful policies, procedures, customs, or usages at the BCDC.

## SECOND CLAIM

### INADEQUATE TRAINING
### UNLAWFUL POLICY OR CUSTOM
### DELIBERATE INDIFFERENCE
### 42 U.S.C. § 1983

83.    Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

84.    Based upon the facts set forth above, ROYSTON contends that Defendant CHRISTIAN and/or Toombs, in their individual and official capacity, through written policy or unwritten practice authorizing the conduct above, deprived ROYSTON of the right to adequate medical care and adequate supervision through inadequate training, as secured by the Fourteenth Amendment to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983, for which CHRISTIAN and/or Toombs are liable in their official and individual capacities, through implementation of unlawful policies, procedures, customs, or usages at the BCDC.

## THIRD CLAIM

### INADEQUATE SUPERVISION
### UNLAWFUL POLICY OR CUSTOM
### DELIBERATE INDIFFERENCE
### 42 U.S.C. § 1983

85.    Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

86.    Based upon the facts set forth above, ROYSTON contends that Defendant CHRISTIAN and/or Toombs, in their individual and official capacity, and/or Turn Key, through written policy or unwritten practice authorizing the conduct above, deprived ROYSTON of

adequate supervision, as secured by the Fourteenth Amendment to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983, for which CHRISTIAN and/or Toombs and/or Turn Key are liable in their official and individual capacities, through implementation of unlawful policies, procedures, customs, or usages at the BCDC.

### FOURTH CLAIM

### DELIBERATE INDIFFERENCE
### ENTITY CLAIM
### 42 U.S.C. § 1983

88. Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

89. Based upon the facts detailed above, Defendant TURN KEY, through policymakers, written policy, or unwritten practice authorizing the conduct above, deprived ROYSTON of the right to adequate medical care and the right to be free from dangerous conditions of confinement that present a substantial risk of serious harm, as secured by the Fourteenth Amendment to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983, for which TURN KEY is liable through implementation of unlawful policies, procedures, customs, or usages at the BCDC.

### FIFTH CLAIM

### DELIBERATE INDIFFERENCE
### INDIVIDUAL CLAIMS
### 42 U.S.C. § 1983

90. Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

91. Based upon the facts detailed above, Christian, Toombs, Platfoot, Nabors, Fowlkes, Johnson, Prentice, Peden, Nations, and Murray deprived ROYSTON of the (1) right to

adequate medical care, (2) the right to adequate supervision, and/or (3) the right to be free from dangerous conditions of confinement that present a substantial risk of serious harm, as secured by the Fourteenth Amendment to the United States Constitution actionable pursuant to 42 U.S.C. § 1983, for which Christian, Toombs, Platfoot, Nabors, Fowlkes, Johnson, Prentice, Peden, Nations, and Murray are liable.

92. Based upon the facts detailed above, Christian, Toombs, Platfoot, Nabors, Fowlkes, Johnson, Prentice, Peden, Nations, and Murray exhibited deliberate indifference to a substantial risk of serious harm by failing to supervise Royston and by failing to protect her from known and obvious risks of serious harm, for which these Defendants are liable under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983.

## SIXTH CLAIM

### EXCESSIVE FORCE
### INDIVIDUAL CLAIMS
### 42 U.S.C. § 1983

93. Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

94. Based upon the facts detailed above, Johnson, Peden, Prentice, and Brauer hog-tied Rebecca without need or justification in a manner that was objectively unreasonable based on the totality of circumstances in violation of the Fourteenth Amendment, actionable pursuant to 42 U.S.C. § 1983 for which these Defendants are liable.

## SEVENTH CLAIM

### EXCESSIVE FORCE
### INDIVIDUAL CLAIMS
### 42 U.S.C. § 1983

95.  Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

96.  Based upon the facts detailed above, Johnson, Pedan, Prentice and Murray put Rebecca in a football helmet while hog-tied without need or justification in a manner that was objectively unreasonable based on the totality of circumstances in violation of the Fourteenth Amendment, actionable pursuant to 42 U.S.C. § 1983 for which these Defendants are liable.

## EIGHTH CLAIM

### EXCESSIVE FORCE
### INDIVIDUAL CLAIMS
### 42 U.S.C. § 1983

97.  Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

98.  Based upon the facts detailed above, Christian and/or Toombs knew that jail employees hog-tied Rebecca and put her in the football helmet without need or justification in a manner that was objectively unreasonable based on the totality of circumstances, and despite that knowledge, neither Christian nor Toombs disciplined any jailer because those acts where in conformance with written policies or unwritten practices in place at the BCDC, the application of which violated Rebecca's rights under the Fourteenth Amendment, actionable pursuant to 42 U.S.C. § 1983 for which these Defendants are liable.

## NINTH CLAIM

### NEGLIGENCE
### COMMON LAW

99. Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

100. Based upon the facts detailed above, agents or employees of TURN KEY owed a duty of reasonable care to ROYSTON in complying with certain standards, rules, regulations, policies, and procedures related to the medical staffing contract, and that TURN KEY's breach of that duty caused Plaintiff's injuries.

WHEREFORE, Plaintiff respectfully requests the Court enter judgment in her favor and against all Defendants in amount in excess of $75,000.00.

Respectfully submitted,

BRYAN & TERRILL

By: *s/J. Spencer Bryan*
Steven J. Terrill, OBA # 20869
J. Spencer Bryan, OBA # 19419
BRYAN & TERRILL LAW, PLLC
3015 E. Skelly Dr., Suite 400
Tulsa, OK 74105
Tele/Fax:    (918) 935-2777
Email: sjterrill@bryanterrill.com
Email: jsbryan@bryanterrill.com

**ATTORNEY LIEN CLAIMED**
**JURY TRIAL DEMANDED**