```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE
                    EASTERN DISTRICT OF OKLAHOMA
 2

 3    (1)  REBECCA ROYSTON,

 4         Plaintiff,

 5    vs.                          Case No. 19-cv-274-RAW

 6    (2)  JOHNNY CHRISTIAN, in his official
      and individual capacity, et al.,
 7
           Defendants.
 8

 9

10

11

12            ZOOM DEPOSITION OF DENA NATIONS
             TAKEN ON BEHALF OF THE PLAINTIFF
13        ON JULY 23, 2020, BEGINNING AT 1:32 P.M.
                     IN DURANT, OKLAHOMA
14

15

16

17

18                       APPEARANCES

19

20    On behalf of the PLAINTIFF:

21    Steven J. Terrill
      BRYAN & TERRILL
22    3015 E. Skelly Dr., Suite 400
      Tuls,a OK  74105
23    (918) 935-2777
      sjterrill@bryanterrill.com
24

25    REPORTED BY:  SUSAN K. McGUIRE, CSR, RPR
```

```
 1    have some college.

 2         Q.    Where did you graduate from high school and

 3    when?

 4         A.    Pottsboro, Texas, in 1983.

 5         Q.    Okay.  And what college did you attend?

 6         A.    Grayson County College.

 7         Q.    Did you ever take any additional college

 8    credits or college courses besides there?

 9         A.    No.

10         Q.    Okay.  Any technical training that you

11    received after high school?

12         A.    No.

13         Q.    You don't have any special certifications,

14    do you?

15         A.    No.

16         Q.    And I'm going to get into what, like maybe

17    CPR, or first aid and things like that that may be

18    attributable to the training that you received at the

19    jail, but aside from what you may have received at the

20    jail, you're not aware of any certifications that you

21    have; right?

22         A.    No.

23         Q.    Okay.  At the time of this incident in

24    August 20, 2017, my understanding is that you were

25    working which shift, the first shift?
```

```
 1        A.   Yes.

 2        Q.   And when did that begin, what time does that

 3   start?

 4        A.   At that time I believe it was 6:00.  I don't

 5   recall exactly because I've worked a lot of different

 6   shifts.

 7        Q.   Understand.  And I understand it's been a

 8   few years since this incident happened so we're just

 9   going to do our best.  6:00 a.m. to when, if you

10   remember?

11        A.   2:30.

12        Q.   Okay.  And on that particular shift you were

13   working with, was it Bonnie Murray and Corporal

14   Johnson?

15        A.   Yes.

16        Q.   Anybody else?

17        A.   I don't believe so, no.

18        Q.   Okay.  And do you recall who was on the

19   shift before, on August 20, 2017?

20        A.   Yes.

21        Q.   And who was that?

22        A.   That would have been Sergeant Brauer,

23   Corporal Prentice and Officer Peden.

24        Q.   Okay.  And do you remember who was on the

25   third shift after you, or I'm sorry, the shift after
```

1      Q.    Where does that take place?

2      A.    I don't recall completely, but I believe it

3  was either in the book-in area or it was in the

4  bubble.

5      Q.    Was it typical to always have that

6  transitional briefing in the same place?

7      A.    Normally, yes, in the book-in area.

8      Q.    Okay.   It may not have been that case on

9  August 20, 2017; is that fair?

10     A.    That's fair.

11     Q.    Is it -- whenever the transitional briefing

12 happens, is it everybody that was on the previous

13 shift, including everybody that's on the current

14 shift.   Does that make sense?

15     A.    Yes.

16     Q.    So do you recall whether everybody was there

17 from the previous shift and on the first shift for

18 August 20, 2017 during this transitional briefing?

19     A.    No, I do not recall.

20     Q.    Okay.   Do you recall the transitional

21 briefing that took place on August 20, 2017?

22     A.    Briefly, yes.

23     Q.    Tell me what you recall of that briefing.

24     A.    That Royston was in cell 67 and that she had

25 came in and that -- that she was intoxicated and that

1    we were going to do -- probably not at that time, but

2    do everything we could to keep her safe until we could

3    get her out of our facility.

4        Q.   Do you recall whether or not Ms. Murray was

5    there when the briefing went on?

6        A.   I think she was.

7        Q.   Do you remember whether Johnson was

8    available when that briefing went on?

9        A.   I think he was.

10       Q.   Do you remember somebody from the overnight

11   shift besides Ms. Peden, whether they were there?

12       A.   I believe, I think that Brauer was also the

13   sergeant of the shift because Corporal Johnson was

14   acting as the sergeant of the shift that day and he

15   would have met with Sergeant Brauer.

16       Q.   Do you recall sitting here today any

17   conversations that Brauer may have had with Johnson

18   about Royston at the beginning of the shift?

19       A.   No.

20       Q.   Do you know whether or not they had any

21   conversations in your presence or whether it was

22   outside your presence -- let me strike that and start

23   over and make it a little easier.   I think it was kind

24   of a poor question.

25            Do you know whether or not Brauer was giving

**Dena Nations**                    **7/23/2020**                    45

```
 1    her.

 2         Q.   (BY MR. TERRILL)   Right.   And I understand

 3    that.   I know you weren't there when she came in at

 4    2:00 in the morning and that's why I phrased my

 5    question that way, was that the first opportunity you

 6    had to see her either on video or in person or would

 7    have been at the beginning of your shift around 6:00

 8    or 6:30; is that fair?

 9         A.   Yes.

10         Q.   But at that point in time based upon your

11    observation in seeing her, you would have determined

12    that she was not fit to be there at the Bryan County

13    Jail; correct?

14         A.   Yes.

15         Q.   What, if anything, is done as you, as a

16    detention officer, not as a shift supervisor, but as a

17    detention officer what is done to bring that to the

18    attention of somebody else -- let me strike that.   Let

19    me start over.

20              To be fair, I understood your testimony to

21    say that even at the outset of your shift it was

22    discussed that Johnson and your shift were going to

23    try and get her out to the hospital; right?

24         A.   Yes.

25         Q.   What involvement, if any, do you have in the
```

1   process of having her transported to the hospital?

2        A.   None.   All I can do is do sight checks and

3   respond to him to let him know the situation of --

4   of -- just let him know what I seen or to tell my

5   supervisor and then he's the one that has to get her

6   out.

7        Q.   Fair to say, that you're there to document

8   and let the supervisor know if she's improved or

9   deteriorated?

10            MR. MILLER:  Object to the form.

11            THE WITNESS:  Yes.

12       Q.   (BY MR. TERRILL)  Okay.

13            MR. WINTER:  Sorry, Steven, just so it's

14   clear, I assume your questions, the last couple

15   questions were in the scope of at the time of the care

16   at issue and not currently; is that a fair assumption?

17            MR. TERRILL:  As of August 20, 2017.

18            MR. WINTER:  Yeah.  That's what I thought

19   you were asking, but I wasn't sure it was clear.

20            MR. TERRILL:  Yeah.  I'm going to be focused

21   on August 20, 2017, ma'am, unless I tell you

22   otherwise; okay?

23            MR. WINTER:  Thank you.

24       Q.   (BY MR. TERRILL)  Do you know what the

25   policy of the Bryan County Jail is when it comes to

1   your responsibility to protect the inmate and get the

2   inmate transported?  And when I say "your

3   responsibility," I mean the detention officer?

4            MS. DARK:  Form.

5            MR. PROCTOR:  Form.

6            THE WITNESS:  Do I know what the?

7       Q.   (BY MR. TERRILL)  What the policy says?

8       A.   I -- no.  I do, but I don't know what the

9   protocol is.  I don't know what they have to go

10  through to, the steps they have to take to get someone

11  out to the hospital.

12       Q.   And I understand that in this particular

13  case, and we'll talk about it here in just a bit, but

14  my understanding is that Mr. Johnson had made one, or

15  several calls to try an arrange for her transportation

16  to the hospital, are you aware of that?

17       A.   I'd seen him on the phone and I feel like

18  that's what he was doing, was trying to get her out of

19  our facility into the hospital.

20       Q.   I'm going to put a finer point on it because

21  that's a fair statement from you, I believe.  But you

22  weren't next to him, you weren't on the phone when he

23  was next to you, you couldn't hear any of that; right?

24       A.   No, because he was at the book-in desk and I

25  was in the bubble.

1        Q.    The only basis that you have for that is you

2    saw him on the video on the phone; right?

3        A.    Yes.

4        Q.    Okay.  Did you ever communicate with

5    Mr. Johnson about his attempts to get in touch with

6    somebody to have her transported to a hospital?

7        A.    I probably did.  I don't remember our

8    conversations, but, yes, we were concerned.

9        Q.    Okay.  Do you know whether or not there's a

10    policy or a procedure that allows a detention officer

11    to try and get the inmate transported to the hospital?

12        A.    Were I as a -- no, I don't know.  I would

13    have to go through my supervisor.

14        Q.    Okay.  And that's really what I was asking.

15        A.    Yes.

16        Q.    During the time of your shift, early in the

17    morning of August 20, 2017, to the time that Rebecca

18    Royston was transferred out of the facility, did you

19    see her condition improve?

20        A.    It did seem during the shift that she did

21    seem to relax a little bit.

22        Q.    Does that in any way impact the need to get

23    her to the hospital, in your mind, or did you believe

24    that she still needed to be transported to the

25    hospital?

1      A.   She still needed to go to the hospital.

2      Q.   I want to -- did you ever enter cell 67

3  during that shift?

4      A.   No.

5      Q.   How long were you in the bubble, or the

6  control room at the beginning of your shift until

7  when -- I'm sorry, let me just rephrase it because it

8  was a poor question.

9           I know that you began your shift in the

10  bubble.  How long were you in the bubble?

11      A.   That I don't recall.  I do know that we, I

12  think that we took two hour shifts, that I was in

13  there for two hours and then maybe Murray went in for

14  two.  I think that's how it worked.

15      Q.   It wouldn't be common for you to spend the

16  whole shift in the bubble; right?

17      A.   No.  Normally we rotated.

18      Q.   Was that in the bubble logbook when somebody

19  else takes over?

20      A.   Sometimes.

21      Q.   But not always?

22      A.   Not always.

23      Q.   You stated you never went in to cell 67.

24  Did you ever have any personal contact with Rebecca

25  Royston while she was there at the Bryan County Jail

1    on August 20, 2017?

2           A.    No, I only did sight checks.

3           Q.    And these sight checks, these would have

4    been the checks that you'd done from the doorway

5    looking into the cell from the hallway; right?

6           A.    Yes.

7           Q.    And those would have been documented; right,

8    on a sheet of some sort that was outside on the door,

9    or next to the door?

10          A.    Yes.

11          Q.    Tell me what you normally would put into a

12   sight check log?

13          A.    Put the date, the time and what I saw.

14          Q.    Your initials?

15          A.    And my initials, yes.

16          Q.    Okay.  Was the facility nurse at the Bryan

17   County Jail when you arrived for shift?

18                MR. WINTER:  Form.

19                THE WITNESS:  No.

20          Q.    (BY MR. TERRILL)  Do you know what time she

21   did arrive?

22          A.    No, I don't recall.

23          Q.    Is that going to be typically documented

24   anywhere?

25                MR. WINTER:  Form.

1          THE WITNESS:  Well, I know it would be

2     documented in her office what time she come to work,

3     in the medical office.

4          Q.   (BY MR. MILLER)  Like maybe a time sheet,

5     her own time sheet of some sort?

6          A.   Yes.

7          Q.   But I guess my question was just, there's

8     not necessarily going to be a specific log in the

9     book-in log sheet or the bubble log sheet when she

10     shows up, is there?

11          A.   There could be.

12          Q.   It's possible.  Okay.  Do you recall what

13     time the nurse got there on August 20, 2017?

14          A.   No.

15          Q.   Did you have any discussions with the nurse

16     that day about Rebecca Royston?

17          A.   If I did, I don't recall.

18          Q.   What involvement, if any, did you understand

19     that the nurse may have had with respect to Rebecca

20     Royston and her being transferred from the facility?

21          MR. WINTER:  Form.

22          THE WITNESS:  That I don't know.  I don't

23     know about the medical.  I don't, in that end of it.

24          Q.   (BY MR. TERRILL)  Okay.  Is it fair to say

25     that you don't recall ever being present when the

1  nurse was evaluating Rebecca Royston?

2        A.    No, I was not present, I don't believe.

3        Q.    Okay.  Do you know whether or not the nurse

4  ever evaluated Rebecca Royston?

5        A.    Yes, just by a report that I read.

6        Q.    Which report was that?

7        A.    The report from the medical.

8        Q.    Okay.  Was it the one page summary from Lisa

9  Platfoot?

10        A.    Yes.

11        Q.    Did you get a chance to review that in

12  preparation for your deposition?

13        A.    Yes.

14        Q.    You wouldn't have reviewed that on August

15  20, 2017; right?

16        A.    No.

17        Q.    Who was the medical director at the facility

18  for August 20, 2017?

19        A.    I don't know.

20        Q.    Do you know whether or not there's a policy

21  that requires the medical director to be notified if

22  there is some sort of attempted suicide or psychotic

23  behavior?

24        A.    I don't know.

25        Q.    Do you recall whether there was any training

1    provided to you that you would need to notify the

2    medical director of some sort of attempted suicide or

3    psychotic behavior?

4        A.   I would report it to my shift supervisor.

5        Q.   Okay.  Do you recall whether it was in the

6    bubble or otherwise seeing Rebecca Royston exhibiting

7    any suicidal behavior on August 20, 2017?

8           MR. WINTER:  Form.

9           MR. MILLER:  Object to the form.

10         THE WITNESS:  Do I recall any -- no.  I

11    mean, other than the, you know, don't know what the

12    actions of her whenever she put her head down in the

13    toilet, I don't know what that was, if that was just

14    involuntary or what she was trying to do.

15        Q.   (BY MR. TERRILL)  Are you aware that others

16    have stated that she was trying to drown herself?

17           MR. MILLER:  Object to the form.

18         THE WITNESS:  Yes, I think.

19        Q.   (BY MR. TERRILL)  Okay.  Did you disagree

20    with the fact that she was attempting to drown

21    herself?

22           MS. DARK:  Form.

23         THE WITNESS:  I don't know what she was

24    trying to do.  I just know that she was -- I saw that

25    she did that and I.

```
 1        Q.   (BY MR. TERRILL)  Is it fair to say there

 2   was at least a concern that she may have been trying

 3   to drown herself?

 4        A.   Yes.

 5        Q.   Do you know once that concern, once you had

 6   that concern what is required under the policy at the

 7   Bryan County Jail?

 8             MR. MILLER:  Object to the form.

 9             THE WITNESS:  Say that again.

10        Q.   (BY MR. TERRILL)  Sure.  If there is a

11   concern that she may be trying to drown herself, do

12   you know what's required by policy?

13        A.   Yes.

14        Q.   What's that?

15        A.   That we're going to -- to get them away from

16   the situation, then we're going to do checks on them

17   to make sure that they do not harm themselves.  And at

18   some point, you know, if she would have been coherent

19   enough we would have put a paper gown on her and -- to

20   keep her from harming herself and keep -- and, of

21   course, we would have in that situation turned the

22   water off so there wouldn't be any water in there.

23        Q.   And did you know whether or not the water

24   was, in fact, turned off to cell 67?

25        A.   I didn't recall that, but now I know that it
```

1    was turned off.

2          Q.    Just based upon materials you reviewed?

3          A.    Yes.

4          Q.    Do you know whether or not, and I understand

5    there's going to be some limitations as to what

6    Mr. Johnson was doing on the phone, I know you weren't

7    on the other end of that line and I know you didn't

8    have audio that let you know all the ins and outs of

9    it, my question is going to be a little bit different.

10         Did you ever have any understanding that

11   Mr. Johnson attempted to reach out to the medical

12   director?

13         MR. WINTER:  Form.

14         THE WITNESS:  I don't know who he called.

15         Q.    (BY MR. TERRILL)  Fair enough.  Do you know

16   whether or not anyone ever told the nurse that there

17   was a concern Rebecca Royston was trying to drown

18   herself?

19         A.    I don't know.

20         Q.    Could somebody have notified the nurse that

21   Rebecca Royston was trying to drown herself?

22         MR. WINTER:  Form.

23         THE WITNESS:  Did someone?

24         Q.    (BY MR. TERRILL)  Should someone?

25         A.    Could someone or?

1      Q.   Should, should someone have told the nurse

2   that Rebecca Royston was trying to drown herself, or

3   there was a concern that she was trying to drown

4   herself?

5           MR. MILLER:  Object to the form.

6           THE WITNESS:  Yes, probably.  I would assume

7   that that would be the best thing to do is let the

8   nurse know.

9      Q.   (BY MR. TERRILL)  I'm sorry, I'm not trying

10  to talk over you.  Sitting here today you don't know

11  whether somebody did that?

12     A.   No.

13     Q.   And you did not do that; right?

14     A.   Not that I recall.

15     Q.   Okay.  Aside from the concern that she may

16  have been trying to drown herself, was there any other

17  behaviors that Rebecca Royston showed that indicated

18  she was a danger to herself?

19          MR. WINTER:  Form.

20          THE WITNESS:  At first whenever we first

21  came in with the flailing of, I guess is the best

22  thing to say, call it, and you know, with the, her,

23  the way she was flailing around on the floor, I would

24  say that she could potentially and we needed to keep

25  her safe from harming herself.

1      Q.   (BY MR. TERRILL)   Do you know whether or

2   not -- do you know whether or not the decision to

3   short-chain her was based upon that, that concern that

4   she was flailing around and could hurt herself?

5      A.   I think that was why that was done.

6      Q.   Okay.  Do you know whether or not the

7   decision to short-chain had anything to do with her

8   putting her head in the toilet?

9      A.   No, I don't know that.

10      Q.   Is it fair to say, because I want to be fair

11   to you, okay, is it fair to say that it could have

12   been either her putting the head in the toilet, or her

13   flailing around, or both?

14          MS. DARK:   Form.

15          THE WITNESS:   Both.

16      Q.   (BY MR. TERRILL)   Okay.  Did anybody ever

17   discuss with you, I know you're in the bubble at this

18   point in time on August 20, 2017, did anybody ever

19   radio or discuss with you why they were short-chaining

20   her?

21      A.   No, they would not do that.

22      Q.   Okay.  That wouldn't be something that would

23   typically happen; correct?

24      A.   No.

25      Q.   But nonetheless, if you're in the bubble and

 1    you see something that's concerning on the video you

 2    can radio to everybody that is there at the facility

 3    about what's going on; correct?

 4        A.    Yes.

 5        Q.    Is that usually, because I'm not aware, but

 6    is that usually a radio that's held right here on the

 7    officers or just a walkie-talkie?

 8        A.    Well, they wear a -- it's on their belt,

 9    their radio, but mine's just down on the counter.

10        Q.    Understood.  At some point in time did you

11    notify the staff that you were concerned about her

12    banging her head against the floor?

13        A.    I don't know if I said banging, I don't know

14    if that's the word that I used.

15        Q.    Okay.  And it may not have been.  At some

16    point in time did you radio staff to let them know

17    that you were concerned that she might be hitting her

18    head on the floor?

19        A.    Yes.  That she was, there was a potential

20    the way she was flopping that she could have, she

21    could harm herself.

22            MS. DARK:  I think we lost Anthony again.

23    Let's take another second.

24            MR. TERRILL:  It's not a bad time, it's

25    2:43, why don't we go ahead and take a quick five

```
 1    minute break.

 2              (Short Break, 2:44 p.m. to 2:53 p.m.)

 3        Q.   (BY MR. TERRILL)  All right.  We're back on

 4    the record after a brief break.  Ms. Nation, you ready

 5    to go?

 6        A.   Yes.

 7        Q.   Okay.  I'm going to go through -- I'm going

 8    to do my best, give me one second, I'm going to try to

 9    put some exhibits on the screen.  Can you see that,

10    ma'am?

11        A.   Yes.

12        Q.   Okay.  If you'll look down here I've marked

13    this as Exhibit 1.  This appears to be the Jail

14    Incident Report and you see that this one looks to be

15    signed by Bonnie Murray; right?

16        A.   Yes.

17        Q.   Okay.  I'm going to give you a chance to

18    just kind of review that and then when you're finished

19    with it, just let me know.

20        A.   Okay.

21        Q.   Okay.  I know that this is not something

22    that you signed, but what I am going to do is I'm

23    going to go down to Exhibit 2, and show you Exhibit 2

24    here.  And is this your signature?

25        A.   Yes.
```

 1       Q.    Okay.  And if you'll take a look at this,

 2   this is another Jail Incident Report, it looks

 3   identical with the exception of the signature.  If you

 4   want to take a look at that real quick.

 5       A.    Yes, that's the same.

 6       Q.    It looks like it's the exact same Jail

 7   Incident Report as far as the details that are in here

 8   as the one that Ms. Murray signed; correct?

 9       A.    Yes.

10       Q.    Did you type up this Jail Incident Report?

11       A.    I don't think that I did.

12       Q.    Okay.  Do you know how you came across this

13   report and would have signed it?

14       A.    I think that the jail administrator wrote

15   that and came to get us to sign it.  I don't recall

16   exactly how that report come about.

17       Q.    Who is the jail administrator at the time?

18       A.    Kristi Toombs.

19       Q.    Did Ms. Toombs tell you that she had typed

20   this out?

21       A.    No.  I don't recall.

22       Q.    Fair to say, you're not sure who typed it

23   up; right?

24       A.    Yes.

25       Q.    Okay.  But nonetheless, you do believe that

1        A.     (Witness nods).

2        Q.     Is that a yes, ma'am?   I'm sorry.

3        A.     Yes.

4        Q.     And then again it looks like at

5   approximately 2:10 p.m. you have another entry where

6   it just says on ground and then you signed it again

7   with your initials; right?

8        A.     Yes.

9        Q.     Okay.   As of 10:35 when you have your first

10  entry, do you know whether or not Rebecca Royston was

11  on suicide watch?

12       A.     No.

13       Q.     Had anyone --

14       A.     I don't -- I'm not sure.   I may have and I

15  may have been told by my sergeant to go down and do

16  sight checks.

17       Q.     Okay.   If someone's on suicide watch is it

18  normal to have them checked every 30 minutes?

19       A.     This -- yes.   I want to -- I thought it was

20  15.   It could be 30.   This says 30.

21       Q.     And I don't disagree with you, ma'am, but

22  the check, or the sheet indicates that it says check

23  every 30 minutes; right?

24       A.     Right.

25       Q.     But your testimony, as I understand it, is

```
 1        A.    No.   No, I know that there had to be the

 2   medical protocol in all the years that I've worked

 3   there that there's been incidents happen after hours.

 4        Q.    Okay.  Did Peden or anyone else that was on

 5   the overnight shift tell you that the nurse had been

 6   contacted regarding Rebecca Royston?

 7        A.    No, they wouldn't have told me.

 8        Q.    Would that be logged anywhere if somebody

 9   had made a request, or had reached out to the nurse,

10   or some other medical professional overnight?

11             MR. WINTER:  Form.

12             THE WITNESS:  I don't know if they fill out,

13   on that protocol if it's a form they fill out or just

14   something that they follow.  I'm not sure.

15        Q.    (BY MR. TERRILL)  You'd agree with me it

16   should be documented though; right?

17             MR. WINTER:  Form.

18             THE WITNESS:  Yeah, I would -- yes.

19        Q.    (BY MR. TERRILL)  Do you know whether

20   Rebecca Royston was injured while she was at the jail,

21   not necessarily whether she came in with injuries, but

22   rather she was actually injured while at the jail?

23             MR. WINTER:  Same.

24             THE WITNESS:  No, I don't think that she was

25   injured at the jail.
```

1      Q.   (BY MR. TERRILL)   And what do you base that

2   on, ma'am?

3      A.   From the time that I was there and observed,

4   I don't know from what happened before I got there, I

5   wouldn't have knowledge of that, but from what I've

6   seen when I got there at 6:00 in the morning and all

7   the things that I've seen, I never see her, you know,

8   I didn't see any blood or anything like that.

9      Q.   Could she have injured her head when she hit

10   it on the concrete floor?

11          MR. MILLER:   Object to the form.

12          MR. WINTER:   Same.

13          THE WITNESS:   She could have, but it's

14   unlikely because we made precautions for her safety

15   and so she couldn't, you know, bang her head -- not

16   bang.   You know, flail her head.

17      Q.   (BY MR. TERRILL)   Right.   You guys, the

18   staff took precautions to make sure she couldn't

19   continue to hit her head on the concrete floor; right?

20      A.   Yes.

21          MR. WINTER:   Form.

22      Q.   (BY MR. TERRILL)   But she had already hit

23   her head before that football helmet was put on there;

24   correct?

25          MR. PROCTOR:   Form.

1           THE WITNESS:  Yeah, I mean, I guess she was

2    hitting her head.  I don't know if she was hitting her

3    head or not.

4           Q.   (BY MR. TERRILL)  You don't have any reason,

5    like I said before, you don't have any reason to

6    dispute that she was hitting her head based upon Marie

7    Peden's report; correct?

8           MR. PROCTOR:  Object to the form.

9           THE WITNESS:  No, but I don't think that she

10   was hitting hear head hard enough to, because there

11   was no visible like bumps, or blood, or anything like

12   that.

13          Q.   (BY MR. TERRILL)  Okay.  Were you close

14   enough to be able to assess whether or not she had any

15   bumps or anything like that on her head?

16          A.   The only time that I would have been close

17   enough to see that was whenever I was doing my sight

18   checks.

19          Q.   Okay.  Did she have the helmet on during

20   your sight checks?

21          A.   I don't recall.  I don't believe so.

22          Q.   I believe the records at least indicate that

23   the helmet was probably removed before that 10:00

24   sight check that you initialed, but I'm sure somebody

25   else will come by and discuss it.

```
 1        A.    Yes.

 2        Q.    Do you disagree with any of those actions,

 3   short-chaining her, putting the helmet on, or trying

 4   to get her to the hospital?

 5        A.    No.

 6        Q.    Were those all attempts to try to protect

 7   her?

 8        A.    Yes.

 9        Q.    As best as you could tell?

10        A.    Yes.

11        Q.    I want to be real clear on all this, do you

12   know whether she hit her head or were you just

13   concerned that she might hit her head with the way she

14   was flailing about?

15        A.    Concerned --

16              MR. TERRILL:  Object to the form.

17              THE WITNESS:  -- that she could possibly hit

18   her head.

19        Q.    (BY MR. MILLER) You reviewed the video

20   yesterday; correct?

21        A.    Yes.

22        Q.    And I think you testified that you reviewed

23   certain portions, including portions where people from

24   staff were inside.  Do you also recall reviewing the

25   video where staff was moving her through the hallway?
```

1      A.    Yes.

2           Q.    Even reviewing the video could you determine

3      a particular moment in which she hit her head?

4      A.    No.

5           Q.    Did you ever see a head wound or head injury

6      on her the entire time that you were there?

7      A.    No.

8           Q.    You testified that you thought she needed to

9      go to the hospital pretty much the moment you get

10     there; correct?

11     A.    Correct.

12          Q.    And you continued to think that the entire

13     time that you were there; correct?

14     A.    Yes.

15          Q.    Was that because you were concerned that she

16     had a head injury or because of your concern about her

17     extreme intoxication?

18          MR. TERRILL:   Object to the form?

19          THE WITNESS:   Her being extremely

20     intoxicated.

21          Q.    (BY MR. MILLER)   Was it clear to you that

22     this was not alcohol, she was on drugs?

23     A.    No.   It was not drunk.

24          Q.    It was something different?

25     A.    Yes.