```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE
                    EASTERN DISTRICT OF OKLAHOMA
 2

 3   (1)  REBECCA ROYSTON,

 4        Plaintiff,

 5   vs.                          Case No. 19-cv-274-RAW

 6   (2)  JOHNNY CHRISTIAN, in his official
     and individual capacity, et al.,
 7
          Defendants.
 8

 9

10

11

12

13            ZOOM DEPOSITION OF BONNIE MURRAY
              TAKEN ON BEHALF OF THE PLAINTIFF
14        ON JULY 23, 2020, BEGINNING AT 10:06 A.M.
                    IN DURANT, OKLAHOMA
15

16

17

18                        APPEARANCES

19

20   On behalf of the PLAINTIFF:

21   Steven J. Terrill
     BRYAN & TERRILL
22   3015 E. Skelly Dr., Suite 400
     Tuls,a OK  74105
23   (918) 935-2777
     sjterrill@bryanterrill.com
24

25   REPORTED BY:  SUSAN K. McGUIRE, CSR, RPR
```

1  watch, ma'am?

2      A.   About the time that I arrived that morning

3  throughout the day, kind of when she was -- just from

4  that point on, basically.  We watched a little bit of

5  how she was when she first arrived, able to walk on

6  her own and stand on her own.

7      Q.   Okay.  And we'll talk a little bit about

8  that too.  Do you recall that the date of the incident

9  was August 20, 2017, this is involving Rebecca

10  Royston?

11     A.   Yes.

12     Q.   And you understand that's why we're here

13  today just to talk about Rebecca Royston and her time

14  at the Bryan County Jail; right?

15     A.   Yes.

16     Q.   Okay.  Now at the time of August 20, 2017,

17  what shift were you working?

18     A.   I was on first shift, which was from 7:00

19  a.m. to 3:00 p.m.

20     Q.   And do you recall on that particular day

21  what time you arrived at the Bryan County Jail?

22     A.   It was approximately 6:30.  I was kind of

23  early.

24     Q.   Okay.  And during your first shift, during

25  this August 20, 2017, time frame, who did you work

1   that shift with?

2       A.   It was myself, Dena Nations, Andrew Johnson.

3       Q.   And who was your immediate supervisor?

4       A.   Johnson.

5       Q.   Anybody else that was on that shift, or just

6   the three of you for that first shift?

7       A.   Just the three of us that day.

8       Q.   Okay.  When does the second shift start?

9       A.   Second shift works from 3:00 a.m., I'm

10  sorry, 3:00 in the afternoon until -- 3:00 to 11:00.

11      Q.   And then obviously there's a third shift?

12      A.   Yes.  Yeah, we had three shifts at that

13  time.

14      Q.   Who was on the second shift on August 20,

15  2017?

16      A.   That I can remember, there was Brauer,

17  Prentice, Peden.

18           MR. MILLER:  Are you talking about the shift

19  before the shift she went on?

20           MR. TERRILL:  No, I'm talking about the

21  second shift.

22           THE WITNESS:  Oh, the second shift.  I

23  honestly don't remember.

24      Q.   (BY MR. TERRILL)  Okay.  No, I understood

25  basically, my understanding was that Brauer, Prentice

1        Q.    Okay.  And when and where were those

2    circumstances?

3        A.    It was just when it got to that point that

4    we felt that she was going to harm herself, was just

5    told that we needed to assist, that she needed to be

6    put in restraints to keep from harming herself.  And

7    that was the first time that I had personally been

8    involved with a football helmet, putting anything on.

9        Q.    And you're talking about when you say "she,"

10   you're talking about Rebecca Royston?

11       A.    Yes.

12       Q.    I want to, I'm going to come back to this.

13   I don't mean to jump around, but I know I'll forget if

14   I don't ask, did you know Rebecca Royston before

15   August 20, 2017?

16       A.    No.

17       Q.    You wouldn't have recognized her, you didn't

18   know her if you met her on the street?

19       A.    No, not at all.

20       Q.    Did you have any understanding of anybody in

21   that Royston family, whether it was Rebecca Royston or

22   her husband, Shelby Royston, did you know anything

23   about them by reputation?

24       A.    No, sir.

25       Q.    Okay.

```
 1    medical attention.

 2         Q.    Let me stop you there, if you don't mind.

 3    You, I think said earlier you saw the video when she

 4    was brought in, was she walking under her own power --

 5         A.    Yes.

 6         Q.    -- or did she need --

 7         A.    When she was first brought in, yes, she was

 8    walking on her own.

 9         Q.    Did it appear that she needed help to walk?

10         A.    No.

11         Q.    Okay.  Would that be significant to you if

12    she was not able to walk under her own power or needed

13    assistance to the cell?

14              MR. MILLER:  Object to the form.

15         Q.    (BY MR. TERRILL)  I didn't hear, you ma'am.

16         A.    Me?

17         Q.    Yes, ma'am.  I didn't hear your answer, I'm

18    sorry.

19         A.    Oh, yes.  I'm sorry.  Yes.

20         Q.    It would be significant to you?

21         A.    Yes.

22         Q.    Okay.  And explain why and what would happen

23    under those circumstances?

24         A.    Well, for example, we had, there was a

25    gentleman that came in extremely intoxicated.  He had
```

1    already gotten sick in the officers' patrol vehicle.

2    He was completely incoherent.  We hollered his name

3    several times, shook him, trying to get him to respond

4    in some way and he could not.  So, therefore, he was

5    directed to the hospital.

6         Q.   Okay.  Was the nursing staff or were some

7    medical personnel there at the jail at that time?

8         A.   At that time, for the gentleman, no.

9         Q.   So that would have been a decision that

10   somebody would have made and he would have been taken

11   to the jail.  Do you know whether or not any

12   supervisor was involved?

13        A.   I was at the time.

14        Q.   Okay.  And did you end up having to get

15   clearance to take him to the hospital?

16        A.   No.

17        Q.   Okay.  You had the ability to do that on

18   your own?

19        A.   Yes.

20        Q.   Okay.  Did you observe Rebecca Royston on

21   August 20, 2017?

22        A.   When I came in, yes.

23        Q.   Okay.  And you had an opportunity to

24   interact with her on some measure; right?

25        A.   Yes.

```
1          Q.    Did you find her to be extremely

2    intoxicated?

3          A.    Yes.

4          Q.    Did you have a concern that she needed to be

5    taken to the hospital?

6          A.    I did, yes.

7          Q.    And when was that concern, when did you

8    first have that concern?

9          A.    Immediately upon arrival.  When Officer

10   Nations and I showed up to together and we went in to

11   the control room to get, basically do a pass down,

12   what we call pass down from the other shift, what all

13   had transpired, what needed to be done and there we

14   were advised of Ms. Royston, her state.

15              And we did observe her for a good while on

16   video, her behaviors and whatnot.  And it -- we did

17   question it, but they did say that at the time that

18   she was brought in she was not in that state, that she

19   was coherent, she was walking on her own.

20         Q.    Did you do anything to determine, I guess,

21   or verify that she was previously coherent and that

22   she was different when you observed her showing up on

23   shift?

24         A.    I did not personally, no.

25         Q.    Did you raise your concerns about her
```

1  needing to go to the hospital with anybody else?

2       A.   The shift supervisor, Andrew Johnson, he

3  already agreed, we had already, they had already been

4  discussing it and he knew as well that she was not fit

5  for confinement at this time.

6       Q.   When you say "at this time," is that at the

7  beginning of your shift when you and Mr. Johnson

8  showed up?

9       A.   Yes.

10      Q.   So if she was not fit for confinement in the

11 view of you and Mr. Johnson, why wasn't she taken to

12 the hospital then?

13      A.   He did try to get that approved.  He had

14 spent all afternoon, or morning trying to get the

15 approval to have her sent out.  I do not know exactly

16 who all he called or what was said, but I do know he

17 was on the phone immediately trying to get her

18 removed.

19      Q.   When you say "immediately," when was that?

20      A.   As soon as we realized her condition.

21      Q.   Was that 6:30, was that 7:00?

22      A.   Between 6:30 and 7:00.

23      Q.   Okay.  So right at -- I mean, you stated

24 that your shift started at 7:00, but I think I know

25 based upon the records and your narrative and

```
 1    everything else you were there a little bit early at

 2    6:30; right?

 3         A.    Correct.

 4         Q.    Do you know if Mr. Johnson arrived around

 5    the same time as you?

 6         A.    Shortly thereafter, yes.

 7         Q.    Between that time of 6:30 and 7:00, you

 8    personally observed Mr. Johnson trying to contact

 9    somebody about getting her taken to the hospital; is

10    that true?

11         A.    No.  Because we -- we had -- we were

12    actually dealing with her, there was an incident that

13    we feared for her safety so we had to go and get her

14    situated and make sure she was safe from harming

15    herself before he was able to be free enough to make

16    those phone calls.

17         Q.    So tell me about how you understand that he

18    was making those phone calls.  Were you there?

19         A.    Yes.

20         Q.    Okay.  Do you know whether he called the

21    jail administrator?

22         A.    Yes, that would have been his first phone

23    call.

24         Q.    And did you listen or hear Mr. Johnson say

25    anything on the phone to the jail administrator at
```

1    that time?

2         A.    I did not.

3         Q.    Okay.   But you know that he did make that

4    phone call?

5         A.    Yes.

6         Q.    And based upon that phone call, what did

7    Mr. Johnson do next that you observed?

8         A.    From my understanding he was not able to

9    make the connection with anybody for a good minute.

10   He said he wasn't able to get a hold of anybody to

11   actually talk with anyone.  So we just kept observing

12   her and doing the rest of our other duties until the

13   nurse got there.

14        Q.    What understanding do you have of the

15   individuals that Mr. Johnson attempted to contact at

16   that time?

17        A.    I couldn't begin to guess.   I mean, that

18   was -- he was the sergeant, I just let him do what he

19   needed to do.

20        Q.    Do you know whether he made more than one

21   attempt to try and call somebody?

22        A.    Oh, yes.

23        Q.    Do you know whether or not he tried to

24   attempt to call the undersheriff?

25        A.    I don't know for a fact, no.

```
 1        Q.    Do you know whether he tried to contact the

 2   sheriff?

 3        A.    I don't know for a fact.

 4        Q.    Do you know whether or not he tried to

 5   contact the nurse?

 6        A.    Again, I don't know for a fact.

 7        Q.    Okay.

 8        A.    I assume he did, but.

 9        Q.    And that's fine.  I mean, I just want to

10   know what you actually for sure know, but.

11             At the time that you arrived at the shift at

12   6:30 the nurse wasn't there; correct?

13        A.    Correct.

14        Q.    There was no other trained medical

15   professional at the jail at that time; right?

16        A.    Correct.

17        Q.    When was the first time that a medical

18   professional showed up at the jail on that day?

19        A.    She usually got there around 8:00 in the

20   morning, sometimes a little earlier.

21        Q.    Would that be consistent with that day, you

22   anticipate that she probably arrived around that same

23   time?

24        A.    Yes.

25        Q.    Okay.  And I'm not asking you to know the
```

1    perfection of her time sheets on that day, but that's

2    your, that's what you state you believe that she

3    arrived around that same time on that date; right?

4        A.   Yes.

5        Q.   Okay.  It is your understanding based upon

6    what you observed and overheard with Mr. Johnson that

7    he made more than one phone call to try and get her

8    admitted to the hospital but was unsuccessful in

9    reaching anybody; is that right?

10       A.   Yes.

11       Q.   Okay.  And so did you have a conversation

12   with Mr. Johnson after the unsuccessful phone calls

13   about what the protocol or plan was going to be next

14   with Rebecca Royston?

15       A.   Not specifically.  It was basically

16   observation, just, again, making sure she wasn't going

17   to harm herself, just try to do what we could to get

18   her help.

19       Q.   Did you know whether or not there was going

20   to be a continued plan to try and continue to call

21   somebody to get her?

22       A.   Oh, yes.

23       Q.   I'm sorry?

24       A.   Yes.

25       Q.   Okay.  And how did you know that?

1        A.    He told me he was going to keep trying to

2   get a hold of everybody.

3        Q.    Okay.  So this would have been shortly

4   before -- between 6:30 and 7:00?

5        A.    Closer to 7:00.

6        Q.    And what time do you understand that Johnson

7   finally got a hold of somebody?

8        A.    I believe it was, I want to say around 2:00,

9   maybe a little after, in the afternoon.

10       Q.    Okay.  But your testimony is that

11  Mr. Johnson --

12       A.    Correction.  I'm sorry, let me correct

13  myself on that.  That's when it was, we got the

14  approval.  He made contact before that to let them

15  know of the situation.

16       Q.    Okay.  And do you know whether or not he was

17  able to reach a supervisor of his, somebody above his

18  authority?

19       A.    Eventually, yes.

20       Q.    Okay.  Do you know when he was first able to

21  pass that information along?

22       A.    I do not know, no.

23       Q.    Okay.  Do you believe it was shortly before

24  2:00 or do you believe it was -- okay.  So you believe

25  he continued to try to call up until early afternoon?

```
1          A.    Yes.

2          Q.    Understanding that there's a video in cell

3    67; correct?

4          A.    Yes.

5          Q.    Okay.  And you're able to monitor that video

6    from the bubble or central control; right?

7          A.    Yes.

8          Q.    Was there still a requirement that you would

9    need to do some sort of check on Rebecca Royston --

10   let me strike that and start over.

11              When you began your shift what was the

12   understanding of how often Ms. Royston needed to be

13   checked?

14         A.    There was not any at the time.  The usual,

15   just keep an eye on her from the camera.

16         Q.    But she was not specifically required to be

17   under any kind of specific check other than just

18   general observation?

19         A.    When we first got there, correct.

20              MR. WINTER:  Object to the form of that

21   question.  I'm sorry I'm a little late.

22         Q.    (BY MR. TERRILL)  When was the first time

23   that you understood that that changed?

24         A.    I'm sorry?

25         Q.    When was the first time on your shift that
```

```
 1   that changed, that she needed to be observed in a

 2   different manner than when you first showed up?

 3       A.   That would be after we had to put her in

 4   restraints.

 5       Q.   Are you aware of any disciplinary issue that

 6   Rebecca Royston had when she was at the jail?

 7       A.   I don't understand.

 8       Q.   Was she subject to any disciplinary issues

 9   by the staff?

10       A.   No.

11       Q.   Okay.  And are you aware of whether or not

12   she struck, or kicked, or hit somebody while she was

13   there?

14       A.   Not intentionally, but, yes, she was

15   flailing all over the place.

16       Q.   Okay.  Just because she was kind of writhing

17   and flailing around on the ground?

18       A.   Yes.

19            MS. DARK:  Form.

20       Q.   (BY MR. TERRILL)  I talked about it with

21   Ms. Peden, I don't know, I forget what you called it,

22   but I called it a transitional briefing, when you came

23   on the previous staff is supposed to kind of update

24   you on what's going on, if there's anything out of the

25   ordinary that you need to know; is that right?
```

1        A.    Correct.

2        Q.    **What did you call it, ma'am?**

3        A.    I'm sorry?

4        Q.    **What did you call it?**

5        A.    Pass down.

6        Q.    **Pass down.  Okay.  What were you informed of**

7  **when pass down took place?**

8        A.    When Nations and I first arrived we went in

9  to the control room.  We did speak with Ms. Peden.

10  While we were watching the video she was telling us

11  about Ms. Royston, when she came in, how her actions

12  had deteriorated.

13              As we were watching the video, we noticed

14  she had managed to get up to her feet and stumbled

15  over to the toilet.  And she started to lean forward.

16  And I'm thinking personally that she was going to

17  vomit.  And I thought to myself, she's going to get it

18  out of her system and start sobering up.

19              But she continued to go forward and went in

20  to the toilet, or what appeared to be going in to the

21  toilet and her legs went up.  And from there we

22  immediately left the control room to go and attend to

23  her.  But I had to turn around and get the key to the

24  cell.

25        Q.    Okay.  Was there not a capability for

```
 1    central control to pop that door remotely?

 2        A.    No.

 3        Q.    I want to go back.  I appreciate what you

 4    told me.  I want to go back.  I understood you to say

 5    that, was it Peden that told you everything that took

 6    place on that shift before?

 7        A.    She hadn't got to everything but she, yeah,

 8    she was in the process of telling us.

 9        Q.    Did she complete the pass down as it

10    pertained to Ms. Royston?

11        A.    I would have to say no because of the

12    situation, it kind of got interrupted.

13        Q.    Okay.  And was there a risk at that point in

14    time that, that by placing her head in the toilet,

15    Ms. Royston was at risk of some sort of self-harm?

16              MR. PROCTOR:  Form.

17              THE WITNESS:  Not of her own accord, but,

18    yes, we felt that she could potentially harm herself.

19        Q.    (BY MR. TERRILL)  Okay.  And you guys were

20    quick to try and get to the cell; correct?

21        A.    Correct.

22        Q.    You were concerned that there was a

23    potential that she could drown herself; right?

24        A.    Correct.

25        Q.    Would you agree with me that that would be
```

**Bonnie Murray**              **7/23/2020**                          **52**

```
 1     an indicator of some sort of suicidal behavior?

 2               MS. DARK:  Form.

 3               THE WITNESS:  I would have to say, no.

 4        Q.   (BY MR. TERRILL)  Okay.  And why would you

 5     say that, ma'am?

 6        A.    Me personally, my definition of actually

 7     saying somebody was suicidal, they would actually have

 8     to be coherent and feel suicidal and say I'm going to

 9     hurt myself or just show signs of intentional harming

10     themselves.

11        Q.    I want to be fair.

12        A.    She wasn't coherent.

13        Q.    I want to be fair to you because I don't

14     want to miscouch this, I want to give you the

15     opportunity.  Are you testifying that somebody needs

16     to verbalize that they're suicidal?

17        A.    No.

18               MR. MILLER:  Form.

19        Q.   (BY MR. TERRILL)  Just that they need to

20     have some, either verbal acknowledgement that they're

21     suicidal or they in your mind need to be coherent?

22        A.    Yeah, coherent and just showing signs of --

23        Q.    Okay.

24        A.    -- unintentionally harming themselves.  She

25     was not coherent.
```

1     Q.   And you'd agree with me that you don't know

2  whether or not she was intentionally trying to harm

3  herself; right?

4     A.   Her state at that time I would say, no, she

5  was not in her frame of mind.

6     Q.   Okay.  Was there any confusion as to what

7  you needed to do if her actions were consistent with

8  self-harm?

9     A.   I'm sorry, can you repeat that?

10     Q.   Okay.  It was kind of a wordy, difficult

11  question.  But you had mentioned that you believed

12  that her actions were consistent with self-harm;

13  right?

14          MR. MILLER:  Object to the form.

15          THE WITNESS:  Not necessarily.

16  Unintentionally, yes, that she could have harmed

17  herself.  As I said, when she fell in the toilet I

18  don't think she was intending to all the way fall in

19  there, she just did not have the balance.

20     Q.   (BY MR. TERRILL)  And did you ask anybody

21  about what the proper course would be if she was

22  intentionally or unintentionally engaging in

23  self-harm?

24     A.   No.

25     Q.   Would that be important to know one way or

1    another?

2              MR. MILLER:  Object to the form.

3              THE WITNESS:  Again, if we felt it was

4    potential, yes.  Again, we were monitoring her to make

5    sure because we did notice that she was trying to put

6    her fingers in her mouth, bite her fingers, she was

7    chewing on her hair, things like that, that's when the

8    decision came about that we needed to protect her from

9    her actions.

10        Q.   (BY MR. TERRILL)  And who went to the cell

11   at that point in time when you guys, I think you said

12   you had to rush back and get the key to open the door,

13   but that you guys rushed to cell 67 shortly after?

14        A.   Officer Prentice and -- Officer Prentice and

15   Peden, and myself.

16        Q.   Yourself.  Okay.  And then upon arriving at

17   the cell the three of you all entered the cell;

18   correct?

19        A.   No.  I kind of, they got there before I did.

20   I was more standing at the doorway.  They had already,

21   were able to get to her and remove her from the

22   toilet.

23        Q.   Now were you able to observe and/or hear

24   what was going on inside the cell?

25        A.   Yes.

1      Q.    Okay.  Did anyone ask her whether or not she

2   was trying to harm herself?

3      A.    No, not during this.

4      Q.    Okay.  Is that, is that consistent with your

5   training, if somebody is engaged in some sort of

6   action like that, wouldn't it make sense to ask

7   whether or not they were trying to harm themselves?

8            MR. PROCTOR:  Form.

9            MS. DARK:  Form.

10           THE WITNESS:  People who are actually in --

11  her eyes were rolling around everywhere, she didn't

12  know -- I mean, you could clearly tell she was not

13  there.  There was -- we could have asked her anything

14  under the sun and she would not have been able to

15  respond.

16     Q.    (BY MR. TERRILL)  I want to go back to

17  something that you had mentioned earlier.  During the

18  course of the deposition I'm trying to take notes and

19  I'm trying to ask questions and so sometimes I miss

20  things and I hate to ask the same question twice, but

21  sometimes it happens.

22           Did you state that once you were a

23  supervisor that you were responsible for having

24  somebody transported to the hospital, it was somebody

25  that was highly intoxicated; right?

```
 1        A.    Correct.

 2        Q.    So my question is along those lines.  Did

 3   Mr. Johnson have the authority to transport Rebecca

 4   Royston from the facility to a hospital when he came

 5   on shift?

 6        A.    No.  When I sent the person out we had not

 7   already accepted them.  They were still in the custody

 8   of the arresting officers.

 9        Q.    Okay.

10        A.    I was in a position to say, no, I can't take

11   them --

12        Q.    Okay.

13        A.    -- until I get documentation that they are

14   fit.

15        Q.    So tell me the policy, or the practice that

16   you understand Mr. Johnson has to go through in order

17   for Rebecca Royston to be transported to the hospital?

18             MR. MILLER:  Object to the form.

19             THE WITNESS:  I couldn't say for fact.  I

20   would assume it was the chain of command.  Being she

21   had already been accepted, she was in the jail

22   custody, he would have had to contact the lieutenant

23   at the time.  It was Hall, Lieutenant Hall.  And then

24   from there he would have contacted, if he couldn't get

25   a hold of Lieutenant Hall it would have been Kristi
```

1    get a hold of the nurse, she was already due to come

2    in that morning anyway, I would assume he would have

3    tried to call and see if she could come in early.

4          Q.    (BY MR. TERRILL)   You don't know whether

5    that happened or not; right?

6          A.    I don't know, no.

7          Q.    Do you know whether the football helmet was

8    an approved medical device to be used?

9                MS. DARK:   Form.

10               THE WITNESS:   I don't know.

11         Q.    (BY MR. TERRILL)   I'm sorry?

12         A.    I don't know if it was medically approved, I

13   mean.

14         Q.    Do you know where it was kept?

15         A.    At the time, at the time we kept it in our

16   file room.

17         Q.    Okay.   When was it determined that Rebecca

18   Royston needed the football helmet?

19         A.    It was shortly after our initial interaction

20   with her.   We did get her placed back down in the

21   floor.   She continued to roll around, to run around.

22   As it progressed we kept noticing that she would

23   swing, whether she was trying to swing her hair out of

24   her face, but she would swing her head around and we

25   worried that she would hit her head on either the wall

```
 1    or the floor.

 2              She was also, it was also placed on there

 3    because, again, she was trying to bite at her fingers

 4    and her hair.  So it was to keep her from trying to do

 5    that.

 6         Q.   At that point in time she'd also been

 7    short-chained; right?

 8         A.   Yes.

 9         Q.   Did you, did you observe that she had struck

10    her head against the concrete floor?

11         A.   No.

12              MR. MILLER:  Form.

13         Q.   (BY MR. TERRILL)  Did anyone else say that

14    they saw her strike her head against the concrete

15    floor?

16         A.   No.  It was a feeling she might, that's why

17    we put it on her as a preventive measure.

18              MR. MILLER:  We were going start the next

19    one soon, I think that is pretty unlikely; is that

20    fair to say?

21              MR. TERRILL:  I think it's going to be,

22    we're going to be running a little bit late.

23              MS. DARK:  I'm sorry, what did he ask?

24              MR. MILLER:  I understand.  I don't want to

25    have her sitting around here, do you think 1:00 more
```

1    short-chain her?

2         A.    I don't know who, who specifically made the

3    decision.

4         Q.    And who went in to actually short-chain her?

5         A.    It would have been me, Tim and I believe

6    Johnson.

7         Q.    Okay.  And it sounds like Peden was staying

8    a little bit later to help out with Rebecca Royston;

9    is that fair, or is there another reason for her

10   staying there?

11        A.    Yes, that's true.

12        Q.    Was there, and I may have asked you this,

13   was there any time that you were provided any training

14   on the use of the football helmet?

15        A.    No.

16        Q.    You would agree that at the time that

17   Rebecca Royston had her head in the toilet and was

18   subsequently removed there was no medical personnel

19   there at the jail; right?

20             MS. DARK:  Form.

21        Q.    (BY MR. TERRILL)  Is that correct?

22        A.    Yes, that's correct.

23        Q.    Were you ever made aware that there needed

24   to be 15 minute checks on Rebecca Royston?

25        A.    Once we had her in the restraints, yes, that

```
 1    was, it was policy.

 2         Q.   When you say "restraints," is that, we're

 3    talking about the same time after removing her from

 4    the toilet and she was short-chained, that's when the

 5    15 minute checks were required?

 6              MS. DARK:  Form.

 7              THE WITNESS:  I don't know if it was at that

 8    time.  I think it was just we were visually on camera

 9    keeping checks on her.  I don't think it was actually

10    officially advised to document until later.

11         Q.   (BY MR. TERRILL)  Okay.  And let's go into

12    the official, what was your understanding of the

13    official command or requirement to have the 15 minute

14    checks?

15         A.   What were the requirements of it?

16         Q.   Who passed that along and where did it come

17    from, if you know?

18         A.   Originally, I don't know who, I think it was

19    just part of the on-the-job training as we went.

20         Q.   So you, sitting here today you don't have

21    any understanding with Rebecca Royston when 15 minute

22    checks would have been required and who would have

23    passed that along to you?

24         A.   That would have been, again, after she was

25    put in the restraints and for me directly, it would
```

1   have come from my supervisor, which would have been

2   Johnson.

3       Q.   Okay.  Understanding that she got, you can

4   observe her from the cell -- or, I'm sorry, let me

5   strike that.

6            Understanding that she's got -- that you can

7   observe her from the cell -- or, I'm sorry, let me

8   strike that.

9            After seeing that you can observe the cell

10  from the camera, are you required to actually do

11  visual 15 minute checks that are logged?

12      A.   Yes.

13      Q.   Okay.

14      A.   We would usually go to the window and look

15  in on her and watch her visually.

16      Q.   Did you perform those checks?

17      A.   I did not per se, no.  I may have done a

18  couple of them, but it wasn't one person every time,

19  it was just random.  Different people would check on

20  her at different times.

21      Q.   Do you recall Peden ever telling you

22  anything else?  I know that you got interrupted with,

23  she was telling you about Rebecca Royston when she put

24  her head in the toilet, did Peden ever finish anything

25  with respect to Rebecca Royston after you guys went in

1  stamp that's up here where my mouse is indicating at

2  the top right of the incident report, it does state in

3  the details that this was approximately 8:15.  Do you

4  agree with the time frame?

5       A.   I do.

6       Q.   Okay.  So just as a quick recap, make sure

7  we're on the same page.  You arrive at the facility

8  around 6:30 a.m. on August 20, 2017; right?

9       A.   That's correct.

10      Q.   And then you're getting sort of a rundown,

11 pass down, some transitional briefing from Ms. Peden

12 about Rebecca Royston when you notice that her head's

13 in the toilet and you guys go to remove her from the

14 toilet; is that right?

15      A.   That is, yes.

16      Q.   And then shortly thereafter a decision's

17 made to short-chain her; correct?

18      A.   Yes.

19      Q.   Okay.  What I want to focus on is it appears

20 to be, maybe an hour or a little bit later than that,

21 at 8:15 or so, a decision is made to remove the leg

22 irons and the wrist restraints or handcuffs from her;

23 is that right?

24      A.   Yes.

25           MR. MILLER:  Object to the form.

```
 1        Q.    (BY MR. TERRILL)   Okay.   And was it at this

 2   point in time that the helmet was removed as well?

 3        A.    Yes.

 4        Q.    Whose decision was it to remove the

 5   restraints and the helmet?

 6        A.    I don't remember exactly who initially said,

 7   I just know that Andrew Johnson came and got me and

 8   said that that's what we needed to do.

 9        Q.    Mr. Johnson didn't pass a long why you were

10   going to be doing this; is that right?

11        A.    Not specifically.

12        Q.    Let me ask it this way --

13        A.    There were concerns about the way she was

14   flailing about that she might injure her ankles or

15   wrists in some way.

16        Q.    So there was initial concern about the

17   toilet.   You guys short-chain her.   Then there's a

18   concern that she's going to hurt herself by banging

19   her head.   You put the football helmet on.

20            And the next time there's a concern, I'm not

21   saying exclusively, but the next time you're telling

22   me about this, that there was a concern about her

23   flailing around and that she might hurt herself, and

24   that it was your understanding that was the reasoning

25   for removing the restraints and the football helmet;
```

1        Q.    Okay.  So this is the time line that, did

2    you -- is this the time line that you referred to when

3    you were talking about some of the materials that you

4    prepared, or not prepared, some of the materials that

5    you reviewed in preparation for your depo?

6        A.    Yes.

7        Q.    Okay.  Is this your handwriting?

8        A.    No.

9        Q.    Do you know whose handwriting this is?

10       A.    I do not.

11       Q.    So, because it's not your handwriting and

12   you don't know whose handwriting it is, you don't know

13   when this was prepared, do you?

14       A.    I do not.

15       Q.    Was this -- have you ever -- had you ever

16   seen this document before this lawsuit was filed?

17       A.    No.

18       Q.    So in other words, and I just want to -- I'm

19   not needling, but I just want to make sure it's a

20   clean record, during the shift that you had on August

21   20, 2017, you didn't see this document which is

22   Exhibit 6, you didn't see this document around her

23   cell, or anywhere else in the jail; right?

24       A.    That's correct.

25       Q.    Okay.  I'm going to skip down to Exhibit 7.

1    You can see it's marked here.  And at the top it says,

2    "Inmate Royston, Rebecca is on suicide watch";

3    correct?

4        A.    Yes.

5        Q.    All right.  Have you seen one of these

6    documents before?

7        A.    Yes.

8        Q.    All right.  And when are these documents

9    typically used?

10       A.    Specifically when somebody is on suicide,

11   but we also use them just whenever we do the, when we

12   feel that they needed to be checked more frequently

13   rather than just on our one hour sight checks that we

14   normally perform.

15       Q.    Are these used when somebody is highly

16   intoxicated?

17       A.    Not usually, no.

18       Q.    Are there different documents that check

19   when somebody's going to be done -- or check whenever

20   -- let me strike that.

21             Is there a different document that is a

22   checklist or a log that's different than this where;

23   in other words, it doesn't say "suicide watch" but it

24   actually records the different time checks?

25       A.    We have books on the door.  Again, when we

1    do you?

2              MR. MILLER:   Object to the form.

3              THE WITNESS:   I honestly couldn't remember

4    whether she did or not.

5         Q.    (BY MR. TERRILL)   Let me stop you right

6    there because I want to break that down.   When you

7    said you're not sure of whether or not she did, are we

8    talking about whether Rebecca Royston banged her head

9    on the floor, or whether Dena Nations called that out?

10        A.    Both.

11        Q.    Okay.

12        A.    I don't recall Nations saying that, but,

13   again, it's been a minute.

14        Q.    Right.   You're not denying that she did?

15        A.    Right.

16        Q.    "Once Officer Nations informed us, Officers

17   Peden, Prentice and Murray, returned to cell 67 with

18   the football helmet."   Is that right?

19        A.    Yes.

20        Q.    "Officers Peden and Murray attempted to

21   place the football helmet on Inmate Royston without

22   much success."   Is that accurate?

23        A.    Yes.

24        Q.    "After finally placing the helmet on Inmate

25   Royston, we attempted to buckle the chin strap around

1    her chin and attach it to the helmet."  Is that right?

2        A.    Yes.

3        Q.    "Once Officers Peden, Prentice and Murray

4    thought they successfully secured the helmet to her

5    head and chin, they exited cell 67."  Is that right?

6        A.    Yes.

7        Q.    "Upon locking cell 67, Office Nations

8    advised Officers Peden, Prentice and Murray that

9    Inmate Royston had successfully removed the helmet

10   from her head."  Do you recall that?

11       A.    Yes.

12       Q.    "Once advised of the situation, Officers

13   Peden, Prentice and Murray re-entered cell 67 to

14   reattach the helmet." Is that accurate?

15       A.    Yes.

16       Q.    States that you guys were "able to reattach

17   the helmet and then exited the cell.  Once all

18   officers involved returned to the book-in area Officer

19   Nations again advised that Inmate Royston had

20   successfully removed the helmet."  Do you recall that?

21       A.    Yes.

22       Q.    "At this time, Officers Peden, Murray and

23   Prentice requested that Corporal Johnson to assist us

24   in replacing the helmet back on properly.  Corporal

25   Johnson and Officers Peden, Prentice and Murray again

1    arrived at cell 67, with Corporal Johnson's assistance

2    were able to properly secure the helmet on Inmate

3    Royston.  They then exited the cell and returned to

4    the book-in area."  Is that all accurate?

5         A.   Yes.

6         Q.   Okay.  And do you recall how many times she

7    actually was able to work the football helmet off of

8    her head?

9         A.   Again, at that time it would have been just

10   the rolling around.  She never, I mean, it wasn't like

11   she intentionally undid it, it just with all her

12   rolling around, moving around, flailing, it seemed to

13   have just come off.

14        Q.   Okay.  But are you, do you recall whether or

15   not -- I'm sorry.  Do you recall how many times she

16   was able to get the helmet off?

17        A.   I believe just twice.

18        Q.   Okay.  So it had to be secured three

19   different times?

20        A.   Yes.

21        Q.   Okay.  Now you were there -- you were

22   present for the -- at the beginning of your shift you

23   were present for when she was transported out of the

24   facility; right?

25        A.   Yes.

```
1        A.    Right.

2        Q.    As far as 2017, you'd only be there for

3   maybe a month or so at that time; right?

4        A.    Right.

5        Q.    If we can --

6        A.    I'm sorry.

7        Q.    If we consider the time off it was about a

8   little over a month; right?

9        A.    Yes.

10       Q.    All right.  I want to go back to something

11  we briefly talked about and that is the understanding,

12  or the lack of understanding about what EMS may have

13  done out in the field with her before she arrived

14  at the Bryan County Jail; okay?

15       A.    I'm sorry, say that again.

16       Q.    I want to go back to what we were talking

17  about about EMS assessing her or contacting her prior

18  to her arriving at the Bryan County Jail.

19       A.    Okay.

20       Q.    How does the jail determine whether EMS has

21  actually cleared or evaluated an inmate before they

22  show up?

23       A.    If it's EMS usually we just have the

24  officers tell us whether or not they were examined at

25  the scene or if it was refused or whatever.
```

```
 1        Q.    Is it fair to say that if the deputies or

 2   the law enforcement officers that are transporting the

 3   inmate will just provide some sort of narrative or

 4   statement as to what took place at the scene with EMS?

 5        A.    Verbal statement, yes.

 6        Q.    And is there anything that's ever done at

 7   the jail to verify the officer's statement with

 8   respect to EMS?

 9        A.    No.

10        Q.    Were you ever told that EMS was not able to

11   check Rebecca Royston out at the scene because she

12   refused?

13        A.    It wasn't specifically said that she

14   refused, it was just told that medical was refused at

15   the scene.

16        Q.    What, if anything, does that require or

17   trigger as far as the detention officers or the staff

18   at the Bryan County Jail to do?  Do you understand my

19   question?

20        A.    I do not.

21        Q.    Let me try it a different way because it was

22   not a good question.  If there's an understanding that

23   there's some sort of refusal and EMS has not had a

24   chance to treat or evaluate an inmate prior to coming

25   into the Bryan County Jail, does that trigger or
```

```
 1    require the staff at the Bryan County Jail to do

 2    something?

 3              MR. PROCTOR:  Form.

 4              THE WITNESS:  If visually they meet the

 5    requirements of a fit, then, no.

 6         Q.   (BY MR. TERRILL)  And if they don't?

 7         A.   Then, yes, if they -- if like you can

 8    visually look at them and see that something is wrong

 9    or that they don't meet the requirements, then, yes,

10    before we say, okay, we're going to accept this

11    inmate, we have the authority to tell the arresting

12    officer that they have to take them to the hospital

13    for documentation that they are fit for confinement.

14         Q.   And I think you talked about that.  You've

15    done that before; right?

16         A.   Yes.

17         Q.   When you came on your shift at about 6:30 on

18    August 20, 2017, did you ever ask anybody whether or

19    not Rebecca Royston had been evaluated by a medical

20    professional?

21         A.   I did not ask directly, no.  Peden just

22    automatically said that they had paramedics at the

23    scene and that medical was refused.

24         Q.   And Peden told you that?

25         A.   Yes.
```

```
 1        A.    Yes.

 2        Q.    Okay.  And the way the reports were written

 3   it sounds like by the time they got in there she was

 4   wedged between the toilet and the wall; right?

 5        A.    Correct.

 6        Q.    It doesn't say that her head was actually in

 7   the toilet?

 8        A.    Her hair was wet from being in the toilet

 9   and everything, just I guess, she had managed to get

10   it out and just got wedged between the toilet and the

11   wall by the time we had arrived.

12        Q.    And you testified earlier that it wasn't

13   your belief that she was intentionally trying to drown

14   herself; correct?

15             MR. TERRILL:  Object to the form.

16             THE WITNESS:  That's correct.

17        Q.    (BY MS. DARK)  It is your belief that she

18   was just intoxicated or high, and was just messing

19   around in that cell; right?

20        A.    It was basically like involuntary body

21   movement, just like she had no control.

22             MR. TERRILL:  Object to the form of the last

23   question.

24        Q.    (BY MS. DARK)  And I'm sure that as a

25   detention officer you've seen high or intoxicated
```

1  inmates before; correct?

2       A.   Not of that magnitude, no.

3       Q.   Okay.  Is there a time limit, whether it's

4  policy or procedure, or whatever, as to how long

5  inmates are to be restrained in that short-chain

6  manner?

7       A.   From my understanding at the time, I believe

8  it was they could be restrained up to, restrained for

9  up to two hours and then they have to be removed.

10      Q.   Okay.  So in this case the short-chain and

11  the helmet were placed on Ms. Royston around 6:30 in

12  the morning, and then removed around 8:15, based on

13  those reports we read earlier; correct?

14      A.   Well, I would say it was around 7:00'ish

15  that we actually put the restraints on her.

16      Q.   Okay.  So either way, it was less than those

17  two hours; right?

18      A.   Yes.  Yes.

19           MS. DARK:  I will pass the witness.

20                    CROSS EXAMINATION

21  BY MR. PROCTOR:

22      Q.   I have a couple questions.  Ms. Murray, I'm

23  David Proctor, I represent Kristi Toombs in this case.

24  Was Captain Toombs present throughout the day on 8-20

25  of '17?

1        Q.    If there's any small discrepancy in the

2   time, whether it was 6:38, 6:43 or something like

3   that, would you agree that the best evidence of

4   precisely when those events occurred is going to be on

5   the video?

6        A.    Yes.

7        Q.    When you said it was accurate, have you

8   memorized to the minute when each of these precise

9   events occurred?

10       A.    No.  And, again, it depends on what clock

11  they're looking at when they see the time because

12  they're not all in sync.

13       Q.    Sure.

14       A.    So usually it's an approximate time.

15       Q.    You testified a little bit about the reason

16  the helmet and short-chains came off around 8:15.  And

17  then I believe Ms. Dark, Jessica, asked you about the

18  policies related to keeping somebody on for two hours,

19  no more than two hours straight?

20       A.    Right.

21       Q.    Do you know whether that played any role to

22  take off the short-chain?

23       A.    It was part, yes, because it was already

24  close to the two hours, hadn't been two hours yet, but

25  it was because of that.  And as I said, she was

```
 1    becoming, beginning to have like lacerations and marks

 2    from the devices.

 3         Q.   Would you agree that if somebody isn't

 4    restrained but still has the helmet on they could take

 5    it off?

 6         A.   Oh, yeah.

 7         Q.   And given her history she very well would

 8    have done that?

 9         A.   Yes.

10         Q.   Or could have done it?

11         A.   Yes.

12         Q.   Can somebody injure themselves with a

13    football helmet that isn't restrained to their head?

14         A.   I would say, yes.

15         Q.   Why?

16         A.   Many different ways.  Even if they were just

17    throwing a fit and wanted to hit it on the wall it

18    could bounce back and hit them in the head, or they

19    could intentionally hit themselves in the head.

20         Q.   It's hard; right?

21         A.   Yes.

22         Q.   You mentioned a Mak, I think you called her

23    Mak?

24         A.   Yes.

25         Q.   Is that Angela Makinen?
```