```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                       EASTERN DISTRICT OF OKLAHOMA
 2

 3    (1)   REBECCA ROYSTON,

 4             Plaintiff,

 5    vs.                                  Case No. 19-cv-274-RAW

 6    (2)   JOHNNY CHRISTIAN, in his official
      and individual capacity, et al.,
 7
               Defendants.
 8

 9

10

11

12                ZOOM DEPOSITION OF KRISTY TOOMBS
                  TAKEN ON BEHALF OF THE PLAINTIFF
13          ON AUGUST 11, 2020, BEGINNING AT 10:04 A.M.
                        IN DURANT, OKLAHOMA
14

15

16

17

18                          APPEARANCES

19

20    On behalf of the PLAINTIFF:

21    Steven J. Terrill
      BRYAN & TERRILL
22    3015 E. Skelly Dr., Suite 400
      Tuls,a OK   74105
23    (918) 935-2777
      sjterrill@bryanterrill.com
24

25    REPORTED BY:   SUSAN K. McGUIRE, CSR, RPR
```

```
 1    football helmet utilized at the Bryan County Jail?
 2         A.   When I reviewed video, yes.
 3         Q.   Will you say that again because I didn't
 4    hear you, ma'am?
 5         A.   When I reviewed the video, yes.
 6         Q.   Okay.  But before August 2017, had you seen
 7    a football helmet utilized at the Bryan County Jail?
 8         A.   Yes.
 9         Q.   When was the first time you recall seeing a
10    football helmet used at the Bryan County Jail?
11         A.   I do not recall.
12         Q.   Was a football helmet utilized when Ken
13    Golden was the sheriff?
14         A.   I do not recall.
15         Q.   Is the football helmet still utilized at the
16    Bryan County Jail?
17         A.   I do not know, sir.
18         Q.   You don't know whether the football helmet
19    is currently in use at the Bryan County Jail?
20         A.   No, sir, I'm no longer there.
21         Q.   When was your last day at the Bryan County
22    Jail?
23         A.   March 13th of 2020.
24         Q.   Did you leave or were you terminated?
25         A.   I resigned.
```

```
 1   exclusively or can anyone contact the doctor?
 2        A.    Anyone.
 3        Q.    Would they need to contact the nurse before
 4   contacting the doctor?
 5              MR. WINTER:  Form.
 6              THE WITNESS:  No.
 7        Q.    (BY MR. TERRILL)  Is that in, is that
 8   specifically provided in any policy or procedure?
 9              MR. WINTER:  Same.
10              THE WITNESS:  We contact the on-call doctor.
11        Q.    (BY MR. TERRILL)  I understand.  Is that
12   anywhere in a policy?
13        A.    Not to my knowledge.
14        Q.    Who was the medical director in August 20,
15   2017, for the Bryan County Jail?
16        A.    I do believe we were under contract with
17   Turn Key.
18        Q.    Was Turn Key considered the medical director
19   in August of 2017?
20              MR. WINTER:  Form.
21              THE WITNESS:  All I know is we had a
22   contract with Turn Key.
23        Q.    (BY MR. TERRILL)  Okay.  Do you know who the
24   on-call doctors were in August of 2017?
25        A.    No.
```

```
 1      A.    No, it's a transport issue.
 2      Q.    What is the comm center?
 3      A.    A communications center.
 4      Q.    Yes.
 5      A.    That's where all the calls go through for
 6   dispatch.
 7      Q.    Is it separate than 911?
 8      A.    I'm not for sure, I just know it's all in
 9   one building.
10      Q.    If a jailer or a supervisor needs to arrange
11   for somebody to go to the hospital does the policy
12   require that they call the comm center first?
13      A.    No.  Only on medical emergencies.
14      Q.    But in the event of a medical emergency do
15   they call the comm center?
16      A.    They will call 911, yes.
17      Q.    And you testified, or at least -- you
18   haven't testified, but I'm assuming based upon your
19   testimony that in the event of a medical emergency
20   they don't need clearance to call 911 or the comm
21   center; right?
22      A.    Correct.
23      Q.    That's not part of any training that shift
24   supervisors receive; correct?
25      A.    Correct.
```

1   A.   Yes.
2   Q.   You just don't know what led up to that?
3   A.   Correct.
4   Q.   Okay. I'm going to read you some bits of
5   what Steve Nabors testified to; okay?
6   A.   Okay.
7   Q.   Sorry, I'm looking at his deposition. And
8   you have not read his deposition; correct?
9   A.   Correct.
10  Q.   Okay. So I'm reading a little bit from page
11  61 of his deposition. Starting at line 20. So I'm
12  going by -- and this is me asking him, and I'll read
13  his response.
14       "So I'm going by just kind of what you told
15  me right there, but it is at 1:00, that's the first
16  time that you're aware that she responded to your
17  call?"
18       His response, "That is the first time that
19  she responded." I asked, "Okay. All right. Have you
20  provided that to your counsel so that everyone can
21  have a copy of that?" He said, "I did during the
22  break."
23       And I'm sorry, I'm backing up a little bit.
24       On page 61, starting at line 10, "The text
25  she sent back to me at 1:00 said, quote, Dimas brought

1   in a female for PI, which is public intoxication, and
2   she has tried to kill herself twice. That is the
3   report I'm getting anyways, is there anyone that can
4   take her to the hospital to be evaluated."
5           So according to Mr. Nabors you sent him a
6   text at 1:00 p.m. saying "Dimas brought in a female
7   for PI, which is public intoxication, and she has
8   tried to kill herself twice. That is the report I'm
9   getting anyways, is there anyone that can take her to
10  the hospital to be evaluated."
11          Do you recall sending a text along those
12  lines to Mr. Nabors?
13      A.  I do not recall.
14      Q.  Okay. Any idea where you would have gotten
15  the idea that she tried to kill herself twice?
16          MR. TERRILL: Object to the form.
17          THE WITNESS: I don't.
18      Q.  (BY MR. MILLER) Okay. I don't mean to
19  imply anything, but what were you doing that day on
20  Sunday?
21      A.  I was being with my family. We're family
22  oriented, we do lunches and dinners.
23      Q.  Okay. Well, according to Nabors the first
24  time that you reach out to him is at 1:00 p.m. I
25  mean, you would normally check your phone from time to

1   time on a weekend; right?
2       A.   I could, unless I was sleeping in.
3       Q.   Okay.  Was there any kind of like family
4   get-together or party that day?
5       A.   I don't recall.
6       Q.   In the aftermath of that text, let's assume
7   you do send that text, and that you were aware of
8   something going on around 1:00 p.m., other than your
9   former testimony which is you did something to get a
10  deputy out there, do you recall at all the steps by
11  which you did that?
12      A.   If it was true to what Mr. Nabors said, I
13  would have contacted him to have a deputy in route.
14      Q.   Okay.  We know a deputy does then come,
15  Mr. Dinapoli; right?
16      A.   Yes, sir.
17      Q.   Okay.  So within the next hour or so that is
18  what happened, you get a deputy out there; right?
19      A.   Yes, sir.
20      Q.   I'm going to read also from Exhibit 9.  Do
21  you see Exhibit 9?
22      A.   Yes, sir.
23      Q.   Okay.  So this is his report and it says,
24  "On August 20, 2017, at 1330, I, Corporal Johnson,
25  received a text from Captain Toombs stating that

```
 1   need to get you a different cell phone, or there's
 2   been a problem getting in touch with you, nothing like
 3   that?
 4        A.   Not to my knowledge, no.
 5        Q.   Okay.  And you would agree with me that as
 6   the jail administrator you're to be available on call
 7   24 hours a day; right?
 8        A.   Yes.
 9        Q.   You discussed a little bit about watching
10   the video with others and I believe you testified that
11   you watched that with Mr. Nabors; is that right?
12        A.   Yes.
13        Q.   Okay.  Is there a reason why you reviewed
14   the video with Mr. Nabors?
15        A.   I just happened to walk in to his office
16   when he was reviewing it.
17        Q.   Okay.  Is there anybody else that you
18   watched the video with?
19        A.   Not to my knowledge.
20        Q.   Has there ever been a discussion with
21   Mr. Fowlkes about him not directing actions at the
22   Bryan County Jail?
23        A.   Not to my knowledge.
24        Q.   Have you ever had any discussion with
25   Mr. Nabors about not directing any of the actions at
```