```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE
                       EASTERN DISTRICT OF OKLAHOMA
 2

 3

 4   REBECCA ROYSTON,

 5            Plaintiff,

 6   -vs-                              Case No. 19-cv-274-RAW

 7   JOHNNY CHRISTIAN, in
     his official and
 8   individual capacity,
     et al.,
 9
              Defendants.
10

11

12                DEPOSITION OF LISA PLATFOOT

13           TAKEN ON BEHALF OF THE PLAINTIFF

14      ON JANUARY 22, 2021, BEGINNING AT 12:58 P.M.

15                    IN TULSA, OKLAHOMA

16                        VIA ZOOM

17
     APPEARANCES
18
     on behalf of the PLAINTIFF
19
     Mr. J. Spencer Bryan (Via Zoom)
20   BRYAN & TERRILL
     3015 East Skelly Drive
21   Suite 400
     Tulsa, OK 74105
22   918-935-2777
     jsbryan@bryanterrill.com
23

24   (Appearances continued on next page.)

25   REPORTED BY:  Shannon S. Harwood, CSR, RPR, CRR
```

Professional Reporters
800.376.1006
www.proreporters.com

EXHIBIT
16

```
 1      A.   I notified her that the patient, inmate was
 2   sent out based on my recommendations, and at that point,
 3   the order was given.
 4      Q.   So is it your understanding that Ms. Royston
 5   was transported to the hospital based upon the
 6   authorization of Michelle Sturdivant?
 7           MR. WINTER:  Form.
 8      A.   No, she was transported to the hospital based
 9   on my recommendations of the -- I visualized her and
10   attempted to assess her vital signs.
11      Q.   (By Mr. Bryan)  Okay.  So you assessed
12   Ms. Royston, made the recommendation to Ms. Sturdivant
13   who then authorized the transport, and that's when
14   things started to happen; is that correct?
15           MR. MILLER:  Object -- object to the form.
16      Q.   (By Mr. Bryan)  I'm trying to understand -- do
17   you understand what I'm -- what I'm asking,
18   Ms. Platfoot?
19      A.   I recommended that she be transferred and then
20   I asked for the order, because I didn't feel that -- I
21   felt that she needed to be transported and
22   Ms. Sturdivant was not there physically to see her, so
23   it's safety first and forgiveness later.
24      Q.   Were you aware of any effort to do anything
25   about transporting Ms. Royston prior to you making the
```



```
 1  recommendation to Ms. Sturdivant?
 2       A.   No, sir.  I don't -- I don't have anything to
 3  do with how they transport.  I make recommendation.  As
 4  a medical professional, I make recommendation.  It is
 5  the sheriff's department or state department or whomever
 6  facility I'm at.  After that, I'm out.  I can't -- I
 7  don't have any control of that.  They're in custody.
 8  That's a security issue.
 9       Q.   Right.  And I'm just talking about your
10  recommendations.  And it was your understanding there at
11  the facility that day that the effort to get Ms. Royston
12  to the hospital began once you made a recommendation to
13  have her transported.  Is that consistent with your
14  recollection?
15            MR. MILLER:  Object to form.
16       A.   Yes, sir.
17            MR. WINTER:  And, Spencer, I don't want to
18  throw you off here.  Continue as long as you need to,
19  but I'm requesting a bathroom break whenever you get to
20  a stopping point.
21            MR. BRYAN:  No, this is fine.  This is a good
22  spot.
23            MR. MILLER:  Okay.  Take another break.
24            THE WITNESS:  Okay.
25            (A recess was taken from 3:07 p.m. to
```



1  3:16 p.m.)

2      Q.   (By Mr. Bryan)  Okay.  We were asking --
3  before the break, I was asking you questions about
4  conversations with three individuals; Ms. Brauer,
5  Ms. Sturdivant and Mr. Johnson.  We had I believe gotten
6  through Ms. Brauer and Ms. Sturdivant, but I want to be
7  clear.  Are there any other conversations about Rebecca
8  Royston that you have not already discussed that you had
9  with Ms. Brauer and Ms. -- or Ms. Sturdivant?

10     A.   No, sir.

11     Q.   All right.  The last person that you
12  identified as having specific conversations about
13  Rebecca Royston would be Mr. Johnson.  Tell me about the
14  conversations that you had with Mr. Johnson about
15  Rebecca Royston.

16     A.   Mr. Johnson approached me not too long after
17  -- like almost immediately after I arrived at the
18  facility, got into the office, started in with my daily
19  routine, Mr. Johnson came to my office and asked me to
20  look at an inmate that was having some erratic behavior
21  that was picked up in the middle of the night and asked
22  me to look at her.  And so I grabbed my belongings and I
23  went to visualize and -- Ms. Royston, who I didn't know
24  her name at the time and we went to the cell and I
25  attempted to get vital signs on Ms. Royston, but she was

```
 1   violently rolling and not -- not responding to my voice
 2   commands and she was naked.
 3            So when I could not get those things done, I
 4   explained to him or told him that she needed to be
 5   transferred out of the facility as soon as possible.
 6   And he asked me, "What do you mean as soon as possible,"
 7   and I said, "By EMS."  That's what I recall.  And then I
 8   returned to my office and continued my daily routine.
 9        Q.   Would it be fair to characterize this
10   encounter that happened before you drafted the progress
11   note?
12            MR. WINTER:  Form.
13        A.   Yes.
14        Q.   (By Mr. Bryan)  So at the time that you're
15   writing the progress note, you have already communicated
16   to Mr. Johnson that it would be your recommendation to
17   immediately transport Ms. Royston by EMS?
18        A.   Correct.
19        Q.   And if we go back and look at your time
20   record, it looks like you clocked in at 8:47 that
21   morning?
22        A.   Uh-huh.
23        Q.   And you charted in the progress notes at 9:45
24   that morning, so between those two times is when you had
25   this encounter and conversation with Mr. Johnson; is
```



```
 1    her course of (Audio distortion).
 2         A.    You -- you -- I lost you.
 3         Q.    -- admission until the time --
 4         A.    I lost you.  Start all over.  I'm sorry.  You
 5    went out and came back in.
 6         Q.    Yeah, I apologize for that.  Can you hear me
 7    now?
 8         A.    Yes, sir.
 9         Q.    Okay.  What do you recall, if anything, about
10    what Mr. Johnson told you about Ms. Royston's course of
11    detention between the time she arrived at the facility
12    and the time that the two of you were having this
13    encounter?
14         A.    The only thing that he told me that she
15    refused medical care at the scene and that's all I know.
16    That was all I was told.  And then I went -- I
17    visualized her and recommended that she leave the
18    facility.  And then I returned to my office and
19    continued what I need to do, because there's one nurse
20    and approximately a hundred-plus inmates.
21         Q.    Right.  When you made the recommendation for
22    transport out of the facility, did you express to
23    Mr. Johnson that that was needed on an emergent basis?
24               MR. WINTER:  Form.
25         A.    Yes, it was urgent, absolutely.  And he felt
```



Professional Reporters
800.376.1006
www.proreporters.com

```
 1   the same.
 2        Q.   (By Mr. Bryan)  How did he express that to
 3   you?
 4        A.   I do believe he said, "That's what I thought."
 5        Q.   Did Mr. Johnson tell you anything about the
 6   use of restraints on Ms. Royston prior to your arrival?
 7        A.   No, sir.
 8        Q.   Were you familiar or had you ever seen the
 9   football helmet that was used at Bryan County?
10        A.   No, I didn't see that specific helmet.  I
11   never seen anybody in that one particularly.  I have
12   seen it -- I have seen helmets used in different
13   facilities, but I did not see that one specifically at
14   that location, no, sir.
15        Q.   Do you recall which facilities where you've
16   seen a helmet?
17        A.   We used that at Lee County Jail in Fort Myers,
18   Florida.  We used it to protect seizure patients or --
19   mostly seizure patients or anybody that was having any
20   kind of behavior with their head.  It was for
21   protection.
22        Q.   Any other facilities where you have seen use
23   of a helmet?
24        A.   Pontotoc County did not use a helmet.  They
25   had a complete padded cell, so no, sir.  It was mostly I
```



```
 1   that.
 2        Q.   And just so the record is clear, between the
 3   9:45 entry and the 1430 entry, you were continuing to do
 4   your -- your jobs there at the facility without anybody
 5   coming and saying, Hey, Rebecca Royston is still here at
 6   the facility or anything like that?
 7             MR. WINTER:  Form.
 8        A.   Correct.
 9        Q.   (By Mr. Bryan)  Who do you believe is
10   responsible for Rebecca Royston remaining at the
11   facility until she was transported sometime after the
12   1500 hour?
13             MR. WINTER:  Form.
14             MS. DARK:  Object to the form.
15        A.   I -- I don't have that information.  I'm not a
16   deputy.  I don't -- I don't know the process to move a
17   patient or inmate.  I know there's security issues, but
18   I don't -- I don't know the process.
19        Q.   (By Mr. Bryan)  And is it correct to say that
20   you do not have independent authority to order
21   Ms. Royston to the hospital?
22        A.   No, sir, I do not.
23        Q.   You have to make the recommendation to Bryan
24   County, and at that point, it becomes their
25   responsibility to carry out what your recommendation is?
```



```
 1       A.   Yes, sir.
 2       Q.   Were you ever aware of any follow-up inquiry
 3   into what happened with Ms. Royston?
 4       A.   No, sir.
 5            MR. WINTER:  Same.
 6       Q.   (By Mr. Bryan)  Did anyone from Bryan County
 7   ever come and ask you about it?
 8       A.   No, sir.
 9       Q.   And do you have any reason to believe that
10   your encounter with Ms. Royston was inconsistent with
11   Turn Key's policy in any way?
12       A.   No, sir.
13            MR. WINTER:  Form.
14       Q.   (By Mr. Bryan)  Nobody from Turn Key came to
15   you and said, you know, We need to change this or modify
16   this or do this better next time, nothing like that?
17            MR. MILLER:  Form.
18       A.   No, sir.
19       Q.   (By Mr. Bryan)  Between the time that you gave
20   the recommendation to Mr. Johnson and the time that
21   Ms. Royston was physically transported from the
22   facility, so just between those two time periods, do you
23   believe that Rebecca Royston received adequate medical
24   care?
25            MR. WINTER:  Form.
```



```
 1                MR. MILLER:  Form.
 2        A.   I was not there to assess her, so I made my
 3   recommendation and unless somebody came back and told me
 4   in the back that she was still up there, I would not
 5   have known, so I -- I can't answer that.
 6        Q.   (By Mr. Bryan)  And would it be fair to say
 7   that you're not -- have -- strike that.
 8             Would it be fair to say that you don't have
 9   any information about any medical care that Rebecca
10   Royston would have received between the time that you
11   gave the recommendation to Mr. Johnson and the time that
12   she was transported from the facility?
13                MR. WINTER:  Form.
14        A.   Correct.
15        Q.   (By Mr. Bryan)  Sitting here today and knowing
16   what you know, would you do anything different if you
17   had to do it again?
18                MR. WINTER:  Form.
19        A.   I -- now, in hindsight, I probably would have
20   been a little more detailed on my original note.
21        Q.   (By Mr. Bryan)  What additional things do you
22   think that you would have included?
23                MR. MILLER:  Form.
24        A.   I would have included that I recommended that
25   she be transported immediately by EMS.
```



```
 1        Q.   It had to --
 2             MR. WINTER:  Form.
 3        Q.   (By Mr. Miller)  -- have been some time after
 4   1:30?
 5        A.   Correct.
 6        Q.   Then it states, "EMS was at scene prior to
 7   booking.  Unable to provide care per deputy report."
 8   That would be information you got from where?
 9        A.   From a deputy.
10        Q.   Okay.  And it states will -- or "Will continue
11   to monitor," correct?
12        A.   Correct.
13        Q.   And that is your signature?
14        A.   Yes, sir.
15        Q.   Okay.  You agree with me that it doesn't say
16   anything about she needs to be transported immediately?
17        A.   Absolutely.  I stated that earlier.
18        Q.   Okay.  You would agree with me that you've
19   already admitted your memory was wrong on a couple of
20   occasions on this incident, correct?
21             MR. WINTER:  Form.
22        A.   Correct, but my memory is not incorrect
23   whatsoever on when I visualized the patient and decided
24   that she need to go.  It was obvious.
25        Q.   (By Mr. Miller)  And when was that?
```

```
 1        A.    At the time I looked in the cell.
 2        Q.    Okay.
 3        A.    That you're saying -- whatever time you said I
 4   looked in the cell, that is the time she needed to -- I
 5   made the recommendation.
 6        Q.    Okay.  That she needed to go to the -- to EMS?
 7        A.    Yeah.  Do you have video of the inside of the
 8   cell and seeing the patient herself?
 9        Q.    I do.
10        A.    Okay.  She is very obvious that she needs to
11   go.
12        Q.    Okay.  But you didn't write that down?
13        A.    No, in retrospect, which is what I said
14   earlier, now that I'm sitting here, I should have wrote
15   that in my note, yes, sir.
16        Q.    And I presume you weren't trying to
17   purposefully backdate the report to make it look like
18   you had seen her earlier in the day, right?  You
19   wouldn't do that?
20        A.    No, sir.  No, sir.
21        Q.    Okay.  Because that would be wrong, right?
22              MR. WINTER:  Form.
23        A.    Absolutely.
24        Q.    (By Mr. Miller)  Now, Andrew Johnson's
25   testimony, I believe, was that he did talk to you very
```

```
 1   even being an issue?
 2        A.   No, sir.
 3        Q.   And you don't recall there being a delay?
 4        A.   No, sir.
 5        Q.   You're under the impression that you gave a
 6   recommendation and it was followed?
 7        A.   Correct.
 8        Q.   And it was followed eventually, she is -- she
 9   is taken out of the facility, right?
10        A.   Correct.
11        Q.   Do you recall at any point after making the
12   recommendation saying, "You're not going fast enough,
13   this is -- this is too much of an emergency, she needs
14   to go STAT"?
15        A.   No, sir, I did not.
16        Q.   What did you think -- I realize you can't make
17   medical -- what's the words -- strike that.
18        A.   Diagnosis.
19        Q.   Diagnosis, I'm sorry.  I realize you can't
20   make medical diagnoses, but you obviously are an
21   individual, you're a person.  What did you think was
22   going on with her?
23             MR. WINTER:  Form.
24        A.   I felt she needed a higher level of care than
25   I or anybody in that facility could give her.
```



```
 1         Q.    And I -- correct me if I'm wrong, but I
 2   remember Mr. Miller asking you a series of questions
 3   about how -- or whether or not the jailers at the Bryan
 4   County Jail, if they were receptive to your
 5   recommendations.  Do you kind of recall that line of
 6   questioning by Mr. Miller?
 7         A.    Yes.
 8         Q.    And it's my understanding that your testimony
 9   was, yes, the jailers at the Bryan County Jail were
10   generally receptive and open to your recommendations; is
11   that correct?
12         A.    Yes, sir.
13         Q.    So if you made -- if you would have made a
14   recommendation to transfer a patient, it would be
15   inconsistent with your prior experience with the jailers
16   at the Bryan County Jail for that transfer to be delayed
17   or them to refuse your recommendation, right?
18         A.    Correct.
19         Q.    Okay.  And, you know, we've talked a lot about
20   the timing of what happened.  Whether or not your
21   assessment or your exam or your visualization of the
22   plaintiff in this case happened at 9:45 or 10:45 or
23   11:45, regardless your recommendation was let's get this
24   lady transported out to an outside facility, was it --
25   wasn't it?
```

```
 1            MR. MILLER:  Object to the form.
 2      A.    Correct.
 3      Q.    (By Mr. Winter)  Right.  So whenever that
 4   happened, your recommendation was the same, correct?
 5            MR. MILLER:  Object to the form.
 6      A.    Correct.
 7            MR. WINTER:  Okay.  I think that's the
 8   questions I've got for you.  We'll see -- I don't know
 9   if Spencer has followups.  I might have a couple after,
10   but otherwise, that's what I've got for you today, Nurse
11   Platfoot.
12            THE WITNESS:  Okay.  Thank you.
13            MR. BRYAN:  Ms. Platfoot, I'm going to have a
14   few follow-up questions and hopefully we can run through
15   this relatively quickly and get us all out of here.
16                      REDIRECT EXAMINATION
17   BY MR. BRYAN:
18      Q.    So, primarily, I want to go back and look at
19   your progress note that we marked as Exhibit 8.  Now,
20   you would agree with me that it very clearly states in
21   the top left-hand corner there that the progress note is
22   entered at 8-20-17 at 9:45 a.m., correct?
23      A.    That's what the note says, yes, sir.
24      Q.    And it is your practice to accurately write
25   down your progress notes and when you enter them,
```



```
 1  talked about.  That's not -- that's not --
 2      A.   Okay.  I know nothing, no.  I knew nothing
 3  about Ms. Royston except for what I seen and evaluated.
 4      Q.   (By Mr. Bryan)  Okay.  But -- and whenever you
 5  did see her, you said, "This woman is in such bad shape,
 6  get her to the hospital now," right?
 7           MR. MILLER:  Object to the form.
 8           MS. DARK:  Object to the form.
 9      A.   No, that's not exactly what I said.  I said
10  she needs a higher level of care.  She needs to get out
11  of the facility and go to the hospital.
12      Q.   (By Mr. Bryan)  Right.
13      A.   Yes, sir.
14      Q.   Okay.  And if they had told you that -- if
15  they had brought you to see Ms. Royston at 9:45 in the
16  morning as opposed to 1300, would your recommendation
17  have been any different?
18      A.   I can't answer that.
19           MR. WINTER:  Form.
20      A.   Because I don't know what her skin would have
21  looked like at 9:45 versus at 1:00.  I don't know her
22  condition.  It is not uncommon for irate or intoxicated
23  or anything, belligerent inmates to sit in a detox cell
24  for any amount of time.  They are incarcerated.
25      Q.   (By Mr. Bryan)  So when Mr. Johnson talked to
```

1      Q    And then sometime around 1500 hours, so
2   approximately two hours later, Rebecca Royston
3   is taken from the Bryan County jail and
4   transported to the hospital.  Do you understand
5   that?
6      A    That's what I understand.
7      Q    Okay.  What I'm trying to understand
8   right now is, from that 1300 hours until 1500
9   hours, what was your understanding of what was
10  being done to get Ms. Royston out of cell 67 and
11  over to the hospital?
12     A    It's not my job to follow up on that.
13  It was my job to make a recommendation to the
14  sheriff's department, and the sheriff's
15  department decides action after that.
16     Q    And that's fair.  So my understanding,
17  then, from your testimony would be at
18  approximately 1300 hours, you would have made
19  the recommendation to Mr. Johnson that she needs
20  to go emergently to the hospital, and once that
21  recommendation is made, then it is up to custody
22  staff to carry out and make that happen.
23          MR. MILLER:  Object to the form.
24          THE WITNESS:  Correct.
25     Q    (By Mr. Bryan)  Okay.  And do you know,