Supplemental report Regarding Rebecca Royston

I have been asked by the counsel for Ms. Royston to review and respond to additional information submitted in her case.

Since my last report, I have continued to work as a correctional health expert and have conducted one additional facility inspection (Lompoc, Federal Bureau of Prisons) as an independent, court-appointed expert. I also continue to work as a member of the Biden-Harris COVID-19 Health Equity Task Force.

In creating this report, I have reviewed the following information;

- Deposition of Dr. Morales
- Report of Dr. Morales
- Report of Dr. Kupiec
- Report of Dr. Goddard
- Report of Nurse Wild

In my prior report, I came to several findings regarding the care and treatment received by Ms. Royston, including;

1. <u>Failure of security staff to conduct a medical assessment at intake</u>.
2. <u>Failure of security staff to respond to medical emergencies with any medical care</u>.
3. <u>Failure of nursing staff to provide any assessment, provide care or initiate timely hospital transfer</u>.

The following represent my responses/rebuttals to the points raised by the defense experts.

1. The requirement for an intake screening and health assessment upon arrival. Intoxication is common among people arriving in jail settings, but this is not a reason to delay a basic assessment that includes vital signs and determines whether something other than, or in addition to intoxication is occurring. For example, in jail settings we may be faced with a patient who is suicidal and intoxicated, or diabetic and intoxicated or even withdrawing from alcohol while intoxicated with some other substance. All of these, and many more scenarios, can be fatal if the jail would take the approach advocated by Dr. Reames, that it is an acceptable practice to wait for the effects of the presumed intoxicant to wear off. A diabetic patient, one suffering a stroke or heart attack or one with injuries could all die in this time period while their intoxication subsides. In the case of Ms. Royston, she presented to the jail with injuries and was both intoxicated and needed significant help to walk. This is exactly the scenario where a health professional needs to immediately determine whether it is safe to detain her. Because the County has made the choice to not have nursing staff present in the jail overnight, despite this very common occurrence, it then fell to the security staff to ensure she was safe to detain or required medical clearance at a hospital. If nursing staff were present to do a focus assessment and also ensure close monitoring of Ms. Royston, then they could have avoided the need for medical clearance at the hospital. The NCCHC addresses this scenario in the following manner;

Exhibit 1

"The first step in the receiving screening (see J-E-02) is medical clearance, which assesses whether the person should immediately go to the hospital. If you decide to accept him or her into the jail, and since you really do not know what health conditions this person has, you should isolate the individual from the rest of the intake population, but be sure that he or she is closely monitored by custody and health staff. Many deaths of intoxicated individuals occur in jails." [1]

The reason that a transfer to the hospital was necessary at the time of Ms. Royston's jail intake is that there was nobody to do this simple assessment once security staff encountered Ms. Royston in her condition. When jails decide not to commit resources for overnight nursing staffing, and still continue to take in admissions overnight, they take on a responsibility to ensure that this assessment occurs even when nursing staff are not present. The U.S. Department of Justice recently released data showing that deaths in jail settings often occur in the early stages of incarceration and that deaths from intoxication and withdrawal have doubled in the reporting period 2000-2016.[2] Dr. Reames opines that I did not establish the clinical need for a transfer to the hospital, but this misses the point. The jail must take steps to ensure that a newly detained person is safe to detain. In some situations, the jail staff cannot or do not complete this assessment, but it does not mean that the person can simply be detained anyways. There must be an effort to make sure they are not in the midst of a medical emergency or other life-threatening concern. Dr. Reames also states that he disputes my characterization that Ms. Royston was in the midst of a mental health crisis. I did not assert this and again, his line of response misses the point. We often do not know what health problems are occurring when a person comes into a jail. The initial screening conducted by security staff often reveals questions that require an immediate answer, in the form of a health assessment. If the County chooses not to have staff available or willing to do such an assessment, then medical clearance at the hospital is needed.

2. The use of the football helmet. My critique about the football helmet was that Ms. Royston needed to be seen at a hospital when staff saw her striker her head on the floor or sustain other head trauma. I did not make the case that while she was on the floor in shackles, the football helmet was causing harm or increasing risk in those moments, as appeared to be the opinion of Dr. Reames. But the jail staff, through their failure to immediately transfer her to the hospital when head strikes were seen, did increase her risk by leaving Ms. Royston on the floor shackled with a football helmet on, instead of sending her for care and assessment. Dr. Goddard makes the claim that the injuries sustained by Ms. Royston were the result of her own actions. It is not my opinion that security staff struck Ms. Royston, and instead have been critical of the lack of transfer to the hospital when they observed her striking her head.

---

[1] https://www.ncchc.org/receiving-screening
[2] https://www.prisonpolicy.org/blog/2020/02/13/jaildeaths/ and
https://www.bjs.gov/content/pub/pdf/mlj0016st.pdf?utm_content=mci&utm_medium=email&utm_source=govdelivery

Exhibit 1

3. Regarding the delay in jail care. One of the most striking omissions in the expert reports is the failure to address the conflicting testimony about when Nurse Platfoot's saw Ms. Royston.  Jail staff have been consistent in reporting that they informed Nurse Platfoot immediately when she arrived that Ms. Royston needed to be seen. In her deposition, Nurse Platfoot said that she was not informed until much later that Ms. Royston needed to be seen. The delay in care after staff had seen Ms. Royston strike her head on the concrete floor and they had put her in restraints and a football helmet for her own safety, is a critical delay and I am stunned that nurse Wild states that the nursing care provided was adequate without even addressing this major disagreement between the security and nursing staff in this case. In his testimony, Dr. Morales was asked whether Ms. Royston's injuries that that he observed were consistent with a traumatic head injury suffered as a result of banging her head on a concrete floor in the jail. Dr. Morales confirmed that that injuries were consistent. This is exactly the reason that prompt transfer to the hospital was warranted when Ms. Royston was observed to strike her head.

4. Regarding the clinical consequences of injuries sustained in the Bryan County Jail. This is not an area of finding in my report. As I have not reviewed the subsequent medical records of Ms. Royston, and am not a neurologist or nephrologist, I would not opine on this area. Ms. Royston's long-term prognosis is not an area that I am rendering an opinion about.

Signed:

_____

Homer Venters, MD, MS

Dated: 4/26/2021

Exhibit 1