## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1)   REBECCA ROYSTON, | |
| Plaintiff, | |
| v. | Case No.: 19-cv-274-RAW |
| (2)   JOHNNY CHRISTIAN, IN HIS OFFICIAL CAPACITY, ET AL. | |
| Defendants. | |

## PLAINTIFF'S RESPONSE TO THE MOTION FOR SUMMARY JUDGMENT BY DEFENDANT JOHNNY CHRISTIAN IN HIS OFFICIAL CAPACITY

Respectfully submitted,

BRYAN & TERRILL

By:   s/J. Spencer Bryan
Steven J. Terrill, OBA # 20869
J. Spencer Bryan, OBA # 19419
BRYAN & TERRILL LAW, PLLC
3015 E. Skelly Dr., Suite 400
Tulsa, OK 74105
Tele/Fax:      (918) 935-2777
Email: sjterrill@bryanterrill.com
Email: jsbryan@bryanterrill.com

May 17, 2021

## T A B L E  O F  C O N T E N T S

TABLE OF AUTHORITIES .................................................................................................ii

I.     BRIEF SUMMARY OF THE ARGUMENT ....................................................................1

II.    RESPONSE TO CHRISTIAN'S STATEMENT OF FACTS .................................................2

III.   FACTS THAT PRECLUDE JUDGMENT AS A MATTER OF LAW .....................................7

       A.     GENERAL FACTS REGARDING REBECCA'S DETENTION ...........................7

       B.     INTAKE PROCESS .............................................................................7

       C.     RISK OF PRETRIAL DETENTION - SUICIDAL BEHAVIOR...........................8

       D.     RISK OF PRETRIAL DETENTION - HEAD INJURY ...................................8

       E.     SUPERVISION OF REBECCA..............................................................9

       F.     ADDITIONAL TESTIMONY FROM CHRISTIAN .......................................9

IV.    ARGUMENT AND AUTHORITY ..............................................................16

       A.     COUNTY CANNOT DEMONSTRATE ENTITLEMENT TO JUDGMENT
              AS A MATTER OF LAW......................................................................16

              1.     CHRISTIAN MISSTATED THE LAW REGARDING
                     UNDERLYING VIOLATIONS ......................................................16

              2.     CHRISTIAN DID NOT MOVE FOR JUDGMENT BASED
                     ON POST-INCIDENT RATIFICATION OF CONDUCT
                     CONSISTENT WITH POLICY ....................................................16

              3.     CHRISTIAN DID NOT MOVE FOR JUDGMENT BASED
                     ON THE CUMULATIVE IMPACT OF JAIL CONDITIONS ...............18

       B.     COUNTY'S LACK OF TRAINING EXHIBITED DELIBERATE
              INDIFFERENCE.................................................................................19

              1.     INTAKE PROCESS .................................................................19

              2.     USE OF FORCE .....................................................................20

              3.     HOSPITAL TRANSPORT ........................................................21

i

C.      COUNTY DID NOT ADDRESS THE CLAIM FOR INADEQUATE SUPERVISION...............22

V.      CONCLUSION.........................................................................................................23

## TABLE OF AUTHORITIES

*Allen v. Avance*,
    491 F.App'x 1, 4 (10th Cir. 2012) ................................................................ 18

*Barney v. Pulsipher*,
    143 F.3d 1299 (10th Cir. 1998) ............................................................... 18

*Bonilla v. Nazario*,
    843 F.2d 34 (1st Cir. 1988) ................................................................... 19

*Christensen v. Park City Mun. Corp.*,
    554 F.3d 1271 (10th Cir. 2009) ............................................................... 17

*Cordova v. Aragon*,
    569 F.3d 1183 (10th Cir. 2009) ............................................................... 17

*Crowson v. Wash. Cty. State of Utah*,
    983 F.3d 1166 (10th Cir. 2020) ............................................................... 16

*Garcia v. Salt Lake Cty*,
    768 F.2d 303 (10th Cir. 1985) ................................................................ 16

*Grandstaff v. City of Borger*,
    767 F.2d 161 (5th Cir. 1985) ................................................................. 17

*Hinkle v. Beckham Cty.*,
    962 F.3d 1204 (10th Cir. 2020) ............................................................... 17

*Holt v. Sarver*,
    309 F.Supp. 362 (E.D.Ark.1970) .............................................................. 18

*J.B. v. Wash. Cty.*,
    127 F.3d 919 (10th Cir. 1997) ........................................................... 17, 18

*J.B. v. Wash Cty.*,
    905 F.Supp. 979 (D. Utah 1995) .............................................................. 17

*John Deere Co. v. American National Bank*,
    809 F.2d 1190 (5th Cir. 1987) ................................................................ 19

*Lance v. Morris*,
    985 F.3d 787 (10th Cir. 2021) ........................................................... 19, 20

*Lopez v. LeMaster,*
    172 F.3d 756 (10th Cir. 1999) ..................................................................... 22

*Malhotra v. Cotter & Co.,*
    885 F.2d 1305 (7th Cir. 1989) ..................................................................... 19

*Oldham v. O.K. Farms, Inc.,*
    871 F.3d 1147 (10th Cir. 2017) ............................................................. 19, 22

*Piotrowski v. City of Houston,*
    237 F.3d 567 (5th Cir. 2001) ....................................................................... 17

*Rhodes v. Chapman,*
    452 U.S. 337 (1981) .............................................................................. 18, 19

## **OTHER AUTHORITY:**

Fed. R. Civ. P. 56 ...............................................................................*passim*

Pursuant to the Local Rules, Plaintiff Rebecca Royston submits the following response to the motion for summary judgment filed by Defendant Sheriff Johnny Christian in his official capacity. (Doc. 177). The motion lacks merit and Plaintiff respectfully requests the Court deny the same.

# I.

### BRIEF SUMMARY OF THE ARGUMENT

Sheriff Christian admitted the policies and practices at the Bryan County Detention Center (BCDC) expose people like Rebecca to a substantial risk of serious harm. Specifically, during his deposition, Christian conceded the intake process at the BCDC is dangerous because it authorizes jailers to admit people at risk of serious injury or death without making any attempt to understand their underlying condition. At the BCDC, jailers are allowed to admit at-risk individuals without any screening or risk assessment in violation of the Oklahoma Jail Standards.

Once an at-risk unscreened person is admitted, Christian's practices compound that risk by: (1) failing to train on Turn Key medical policies that govern fitness for detention; (2) failing to monitor and supervise at-risk people following admission; (3) failing to have any written guidance on use of restraint devices; (4) failing to train staff on proper use of restraint devices; (4) authorizing the use of restraint devices that have the safety features completely removed; (5) failure to train staff to medically assess at-risk people following the untrained use of unsafe restraint devices; and (6) a failure to adopt adequate procedures for the prompt assessment and transport of at-risk people for higher-level care.

Christian's practices, both individually and collectively, exposed Rebecca to a risk of serious harm. For example,

- Rebecca arrived at the BCDC in an incoherent and "highly" intoxicated state beyond what any jailer had seen before;

- Rebecca needed substantial assistance to get from the transport vehicle in the sally port to the isolation cell because she could not ambulate on her own;

- Rebecca was admitted without a screening and locked in an isolation cell with no effort to contact any medical provider to assess her underlying condition;

- Within hours Rebecca was exhibiting suicidal behaviors and hit her head on the concrete;

- Rather than conduct an assessment or contact medical, jailers placed Rebecca in a modified football helmet with the safety padding removed, and then combined use of the helmet with a chain restraint;

- After nearly two hours of repeatedly banging her head on the ground and walls, the restraints were removed, but no assessment was provided to determine whether Rebecca had suffered an injury;

- Instead, Rebecca was forced to languish on the floor of the isolation cell well beyond the time it takes for someone to begin sobering up;

- Despite multiple jailers appreciating that she needed higher-level care, Rebecca was left on the cell floor from 2:15 a.m. until she was transported to the emergency room at 3:30 p.m.

- Her vital signs were never taken at any point throughout her detention.

Despite acknowledging that his intake practice is dangerous, Christian continued those practices at the BCDC with indifference to the consequences which supports the inference that Christian exhibited deliberate indifference to conditions that served as the moving force behind the injuries and damages suffered by Rebecca. In fact, when given the opportunity, Christian admitted that everything associated with Rebecca's detention was consistent with policy, which exposes the county to unlimited liability for any constitutional violation arising from the facts of this case.

## II.

### RESPONSE TO CHRISTIAN'S STATEMENT OF FACT

1-8    Plaintiff generally admits these paragraphs with the following exceptions: (1) the record citations do not support the ingestion of bath salts in fact (¶ 2); (2) the described behaviors are not consistent with a person who answers "clearly with appropriate responses" or being "capable of making her own decisions." (¶ 5); and (3) Peden unambiguously refuted that Rebecca was capable of walking without substantial assistance (¶ 6). (Ex. 6, Peden depo, p. 53:6-10) ("She wasn't walking on her own.")[1]

9.    *Disputed in part*. The citation does not support the conclusion that Rebecca was acting "basically normal for an intoxicated person," or that she exhibited "no signs that she

---

[1] Exhibits are included with an appendix filed contemporaneous with the responses and apply to all responses to Defendants' Rule 56 motions.

needed medical help between 2:00 a.m. and 6:30 a.m." In truth, Rebecca was so intoxicated that she could hardly stand, she tried to drown herself, and hit her head on the concrete floor. (Doc. 177; Ex. 1, Peden Report)

10.    *Admitted in part*, *disputed in part*. The record citation supports the inference that following the pass down meeting at shift change, jailers on both shifts subjectively knew that Rebecca's condition was deteriorating, that she needed to go to the hospital, and that jailers did nothing to arrange transport out of the facility. Plaintiff disputes that Nations was told Plaintiff was "coherent" at admission because that conclusion is not supported by the record citation. Further, Plaintiff disputes that Murray was told Rebecca was "coherent" at admission because that assertion is not supported by Nations or the absence of an intake screening. (Ex. 2, Booking Record).

11.    *Admitted*, *clarified*, *immaterial*. The citation supports the inference that jailers subjectively knew Rebecca was not medically cleared at the scene for incarceration. Even so, Christian admitted that a field clearance by EMS is irrelevant to whether a person is fit for incarceration *once they arrive at the BCDC*. Pursuant to the Oklahoma Jail Standards, an intake screening is mandatory. (Ex. 3, Christian depo., pp. 174:5 - 175:4; Ex. 4, Okla. Jail Standards, 310:670-5-1(1)(C))

12.    *Admitted in part*, *disputed as phrased*. There is record evidence that jailers knew Rebecca needed hospitalization; Christian's use of the phrase "ideally" improperly suggests continued detention was nevertheless appropriate. (Ex. 5, Murray depo., p. 41:4-6)

13.    *Disputed*. The citation does not support the contention. Nations and Murray both admitted they had no idea what Johnson was communicating, but they subjectively knew that Rebecca was at risk from continued detention. Christian admitted responsibility for hospital transport does not rest with any one employee; every jailer can initiate a transport. (Ex. 5, pp. 41:4-6, 65:25 - 66:4 ("I don't know who all he called."); Ex. 6, pp. 45:2-14, 47:12-25; Ex. 3, pp. 132:14 - 133:8).

14-15.    *Admitted in part*, *disputed in part*. Plaintiff admits Rebecca exhibited suicidal behaviors when she tried to drown herself, but disputes that jailers did not subjectively believe she was suicidal: jailers placed Rebecca on suicide watch and reported that she was suicidal. She also disputes the characterization that jailers were attempting to prevent an "accident[]" as opposed to a second suicide attempt. (Ex. 7, Toombs text msg; Ex. 8, Suicide log; Ex. 28,

3

Fowlkes report; Ex. 29, Fowlkes depo., p. 45:16-23)

16-19. Plaintiff generally admits the paragraphs with the following exceptions: (1) the football helmet was used in response to Rebecca hitting her head (¶ 16); (2) use of restraints was not the "only option": jailers could have transported Rebecca to the hospital, arranged for a mental health or medical consult, or called a medical provider for direction (¶ 17); (3) the "sole purpose" for using the football helmet was not "to prevent injuries," but more accurately: to prevent *further* injuries. (Ex. 1; Ex. 30, Christian depo (second)., p. 22:11-14)

20.    *Admitted in part*, *disputed in part*. Rebecca admits that Peden, Murray, and Johnson did not personally observe Rebecca hitting her head, but the fact is immaterial because "OFFICER NATIONS informed <u>all officers involved</u> that inmate ROYSTON had proceeded to bang her forehead [sic] against the concrete floor." (Ex. 1) (emphasis added). The report contradicts Nations' assertion that she did not observe Rebecca hit her head or report that Rebecca was banging her head. Rebecca also disputes that jailers did not observe any injuries. Rebecca was covered in bruises. (Ex. 9, Campbell report ("she looks like one big bruise"), Ex. 10, Progress Notes ('copious amount of bruising and discoloration on entire body'), Ex. 11, Alliance Durant ("multiple bruises over entire body included head."))

21.    *Disputed in part*, *admitted in part*. Rebecca admits Prentice observed her bang her head on the ground on multiple occasions, but disputes that she had no observable injuries. Rebecca's head was covered in bruises. Prentice's belief about Rebecca's injury presents a fact question. (Ex. 20, Prentice depo., pp. 85:21 - 86:8).

22.    *Admitted in part*, *disputed in part*. Rebecca disputes that Johnson was not aware Rebecca hit her head; the head strike was reported by Nations to "all officers involved." (Ex. 1)

23.    *Admitted in part*, *disputed in part*. Rebecca admits she was placed on suicide watch but disputes her placement was unrelated to her suicidal behaviors. Rebecca also disputes that "sight checks" were performed every 15 minutes from the time she was placed in the helmet until discharge. The record supports the inference that no sight checks occurred; at most the suicide log shows inconsistent *monitor* checks from 10:20 a.m. to 2:48 p.m. Observing from a monitor is not a sight check. (Ex. 7; Ex. 8; Ex. 12, Turn Key Policy J-26 (Suicide Prevention Program)).

24.    *Disputed in part*, *admitted in part*. Rebecca admits the suicide log was prepared solely from monitor checks and that no physical welfare check ever occurred. Rebecca disputes

that any door checks occurred: there is no log of any door check, and Christian allowed video to erase that would corroborate or refute the contention despite a preservation letter. (Ex. 13, Preservation letter)

25-27. *Admitted in part, disputed in part, immaterial, clarified.* Rebecca admits paragraph 25; the assertion in paragraphs 26 and 27 regarding non-emergent needs is immaterial; Christian admitted Johnson could transport Rebecca to the hospital. Further, neither Nations nor Murray can corroborate what was communicated between Johnson and anyone he spoke with. The assertion that Johnson made "multiple" calls "throughout the day" is disputed as fatally vague and ambiguous. (*See* Resp. to Para No. 13).

28.     *Admitted in part, disputed in part.* Platfoot testified that she was not alerted to Rebecca's presence at the jail until 1:00 p.m. and then immediately advised Johnson that Rebecca needed to go to the hospital immediately. Rebecca was not transported for another 2 hours. (Ex. 14, Platfoot depo, pp. 88:21 - 89:1, 181:5-9)

29.     *Disputed as immaterial.* Platfoot never went inside the cell, and she never assessed Rebecca, so it is immaterial that she did not "see any evidence of a head injury," and there is no evidence that she was told Rebecca had banged her head on the ground. Even so, it was nevertheless "obvious" to Platfoot that Rebecca's condition required emergent care. (Ex. 14, pp. 129:3-5, 137:6-11).

30.     *Admitted in part, disputed as vague and ambi*guous. Rebecca admits Johnson called Hall, but disputes that he actually called Toombs; Johnson is merely speculating, and Christian failed to support the assertion with the call detail log for the BCDC. Rebecca disputes that Johnson was on the phone "all day" as vague and ambiguous.

31.     *Admitted in part, disputed as immaterial.* Rebecca was suffering from an "obvious" emergent medical condition making Christian's reliance on non-emergent authorizations immaterial. Rebecca admits that Johnson never called the Sheriff. (*See* Resp. to Para No. 29; Ex. 14, pp. 88:21 - 89:4 ("It was urgent, absolutely.")).

32-36. Rebecca generally admits the paragraphs with the following exceptions: (1) Lighthouse logged the call at 1:30 p.m. (¶ 33) (*see* Ex. 15, Lighthouse Call Log; (2) Rebecca disputes the characterization that she was taken the hospital "shortly thereafter." Hospital records show a received time of 3:23 p.m. (Ex. 11). The distance from the jail to the Alliance Durant is

5

1.7 miles.[2]

37-40.  Rebecca generally admits the paragraphs with the following clarifications: (1) Dr. Morales clarified that, based on records he was not provided by defense counsel who prepared his affidavit, it was more likely than not that Rebecca suffered her head injury when she banged her head on the floor at the BCDC. Accordingly, the assertion in the affidavit is misleading because (1) Dr. Morales was not given complete information; and (2) pretrial detention presented a significant risk to Rebecca, as evidenced by her head injury, and pre-clearance at the hospital is intended to address that risk, (¶ 37); (2) Dr. Morales acknowledged that his affidavit on this issue is limited to the act of placing a helmet on a person; he did not claim that using a football helmet with the safety features removed was safe or would not cause injury (¶38). (Ex. 16, Morales depo., pp. 23:14 - 25:14, 44:4 - 45:16, 71:14-20)

41-46.  Rebecca contends the paragraphs are largely immaterial. Christian admitted the entirety of the conduct associated with Rebecca's detention was consistent with the official policy and practice of Bryan County. Accordingly, the relevancy of written policy is limited to: (1) supporting an inference of deliberate indifference based on deviations; and (2) identifying obvious training deficiencies based on written duties and expectations. (Ex. 3, pp. 129:21 - 130:5)

47-51. Rebecca generally admits the paragraphs with the following exceptions: (1) Rebecca disputes any inference that prior experience alone made Toombs an appropriate selection for jail administrator; Christian ran for office because of safety concerns with the prior administration (¶ 47) (Ex. 3, p. 12:8-12); (2) Rebecca disputes any inference that it was reasonable for Christian to rely on Toombs's naked assurance regarding the "quality" of BCDC policy (¶ 48); (3) Rebecca disputes any inference that it was reasonable for Christian to "task" Toombs with responsibility to train staff, or that meetings with Toombs or "new hires" were adequate to address obvious deficiencies with jail operations or identify issues of policy compliance, (¶ 49); (4) Rebecca disputes that Prentice, Murray, Peden, and Nations were trained on the Oklahoma Jail Standards; the citation merely recites Christian's unsupported belief; (Ex. 5, pp. 26:25 - 27:3); (5) possession of a policy manual is not training, receipt of "on-the-job" training lacks specificity in the reference, it does not identify any *relevant* training, and a jury can readily find that training on issues immaterial to the deficiencies at issue is not reasonable. (¶

---

[2] *See* Google Maps (t.ly/fFEV) (last visited 05/03/21)

51).

52-55.   Rebecca generally admits the paragraphs with the following exceptions: (1) whether Christian was physically present at the jail during Rebecca's detention, or had contemporaneous knowledge about her detention, is immaterial to supervisory liability or entity liability, (¶ 52); and (2) having no information about deficiencies in the training program is not synonymous with taking reasonable steps to address *obvious* deficiencies; Christian retained full authority over the training program at the BCDC, (¶ 54) (Ex. 3, p. 21:6-11).

### III.

#### FACTS THAT PRECLUDE JUDGMENT AS A MATTER OF LAW

Plaintiff adopts and incorporates by reference the additional facts that preclude summary judgment set forth in responses to the motions for summary judgment Plaintiff filed as if fully set forth herein. Plaintiff includes the following facts here:

#### A.   GENERAL FACTS REGARDING REBECCA'S DETENTION

1.   Christian admitted the entirety of the conduct relative to Rebecca Royston was consistent with the official policy and practice of Bryan County. (Ex. 3, pp. 129:21 - 130:5).

2.   Christian did not cross-train staff on the Turn Key medical policies. (Ex. 17, Toombs depo., p. 55:8-11).

3.   Turn Key did not cross-train on BCDC policies or the jail standards. (Ex. 14, pp. 55:3-11, 104:7-10)

4.   No one obtained vital signs for Rebecca at any time during her detention. (Ex. 10)

5.   Rebecca was never medically assessed at the BCDC. (Ex. 2; Ex. 10)

#### B.   INTAKE PROCESS

6.   Basic correctional standards and Oklahoma jail standards require that a medical assessment occur for every person who is booked into a jail. (Ex. 18, Venters report; Ex. 4)

7.   When a person is "[i]ntoxciated to the point of not being able to answer questions correctly, sit up or walk," the Turn Key "Guidelines for Fits" required medical documentation identifying "FIT FOR INCARCERATION" before the person can be accepted for detention. (Ex. 19, FIT For incarceration)

8.   Rebecca was "highly" intoxicated upon arrival, she was totally incoherent, unable to "answer questions," and unable to walk on her own. (Ex. 2; Ex. 6, p. 49:6-18)

9.      Rebecca was placed directly into an isolation cell and did not receive an intake or medical screening because she was too intoxicated to answer questions. (Ex. 2)

10.     Christian admitted the intake procedure at the BCDC could expose people like Rebecca to a substantial risk of serious harm. (Ex. 3, p. 41:16-21)

11.     Faced with the inability to conduct an intake assessment, and the documentation from arresting officers that Ms. Royston had a dangerous mix of substance use, mental health and medical problems, she should have never been admitted to the jail. (Ex. 18)

12.     Because Ms. Royston arrived at a time when no health staff were present, jail staff should have directed Bryan County officers to take her to the nearest hospital emergency department for evaluation. (Ex. 18)

13.     Given the obvious injuries to Ms. Royston, and the inability of staff to complete the medical intake required by their own policies as well as Oklahoma jail standards, the only reasonable course of action was hospital transfer for medical clearance. (Ex. 18)

C.      **RISK OF PRETRIAL DETENTION - SUICIDAL BEHAVIOR**

14.     At approximately 6:30 a.m., Peden and Murray told Prentice that Rebecca was drowning herself in the cell toilet. (Ex. 1)

15.     In response, the water to Rebecca's cell was shut off, but nobody called medical and no assessment was conducted to evaluate her condition. (Ex. 1; Ex. 10)

16.     Rebecca was placed on suicide watch at 10:20 a.m. (Ex. 8)

17.     At 1:00 p.m., the jail administrator sent a text acknowledging that Rebecca "has tried to kill herself twice that is the report I'm getting." (Ex. 7)

18.     No medical or mental health provider was called in response to Rebecca's suicidal behavior until 1:00 p.m. (Ex. 15)

D.      **RISK OF PRETRIAL DETENTION - HEAD INJURY**

19.     In addition to receiving information that Rebecca was attempting to drown herself, Prentice also observed Rebecca hit her head. (Ex. 20, p. 58:22-24)

20.     Subsequently, Nations reported to "all involved officers" that Rebecca hit her head on the floor. (Ex. 1)

21.     No medical or mental health provider was called in response to Rebecca hitting her head. (Ex. 10)

22.     Dr. Morales, Rebecca's neurologist, acknowledged it is likely Rebecca suffered her head injury at the BCDC from striking her head. (Ex. 16, pp. 59:17 - 60:5)

23.     The facility football helmet was put on Rebecca in response to her hitting her head. (Ex. 1)

24.     Christian permitted use of the football helmet without any training whatsoever and without any written guidance regarding: (1) appropriateness of use on a given person; (2) length of time a person can remain in the helmet; (3) combining the helmet with a short-chain; (4) when a helmet can be safely removed; and (5) whether to assess a person once the helmet is removed. (Ex. 3, pp. 166:3 - 168:9)

25.     Christian permitted use of the football helmet with the safety features removed. (Ex. 21, Email from Shutt)

26.     Rebecca was left in the helmet and chain restraints for almost two hours. (*Compare* Ex. 1 *with* Ex. 22, Johnson report)

27.     No one medically assessed Rebecca for injuries after removal of the restraint devices despite a written policy requiring a medical assessment. (Ex. 23, BCSO Use of Force policy; Ex. 10, Progress Notes)

E.     SUPERVISION OF REBECCA

28.     When the Turn Key LPN arrived at 8:47 a.m., she testified that was not alerted to Rebecca, or her condition, until 1:30 p.m., and she would not know Rebecca was at the BCDC because there was no intake screening to review.  (Ex. 14, pp. 68:20-24; 184:11 - 185:19)

29.     The severity of Rebecca's medical condition, and her need for emergent medical care, were "obvious" according to the Turn Key LPN. (Ex. 14, p. 136:18-24)

30.     When Rebecca arrived in the ER, her temperature was 106.1. (Ex. 11)

31.     Emergency room records indicate that Rebecca "banged her head against the concrete wall several times last night," that "patient appears obviously ill," that her "last known well witnessed [] is greater than 2 hours of the patient's arrival." (Ex. 11)

F.     ADDITIONAL TESTIMONY FROM CHRISTIAN

32.     Christian testified that all of his policies and procedures were followed relative to Rebecca's detention, and further testified that no discipline at all was warranted for anyone. (Ex. 3, pp. 129:21 - 130:5; 181:11-21)

33.     Prior to assuming office, Christian knew the sheriff ran jail, but he had no prior correctional experience. (Ex. 3, p. 13:9-19)

34.     Christian had no specific jail training other than generalized information he received at a sheriff's academy, but there was little depth on a wide variety of topics. Christian has no other training specific to the jail. (Ex.3, pp. 14:16-24; 15:8 - 16:3; 16:12-18; 18:3-6)

35.     Instead, Christian operated the jail by: (1) hiring a Jail Administrator; (2) making sure everything is running appropriately; and (3) wanting policy and procedure to be followed (Ex. 3, p. 18:17-24).

36.     Christian contends this operational style was reasonable because of a lack of complaints, feedback he received, and from his personal observations. But Christian also admitted that waiting until a complaint happens is not a good way to run a jail because some risks are predictable. (Ex. 3, p. 71:2-24; 72:24 - 73:9).

37.     The people providing feedback included: (1) bail bondsman; (2) police officers; and (3) outside citizens. (Ex. 3, pp. 74:19 - 75:4)

38.     None of the bail bondsman had experience working a jail, and none had any credentials that would make them a reliable source of information, and there is no evidence the "police officers" had any personal knowledge of how the jail was operating. (Ex. 3, 76:1-12)

39.     As part of the "personal observation," Christian admitted that he never watched anyone try to book-in an intoxicated person like Rebecca. (Ex. 3, 78:3-11)

40.     Christian relied on a Jail Administrator to run jail in 2017. Christian hired Toombs because she had years of experience; he delegated the day-to-day operation of the facility to her while retaining all final policymaking authority. (Ex. 3, pp. 19:21 - 20:5; 20:21 - 21:5; 21:12-15)

41.     Christian hired Toombs and put her in charge of the jail even though he had no knowledge of whether Toombs had any training to perform the job of Jail Administrator. (Ex. 3, pp. 24:14 - 25:14)

42.     Christian is the person responsible for ensuring Toombs received that training, but he did nothing to ensure she received it, while acknowledging that it would be important for the person in that role to have specific training because they need to know how to (1) manage inmates correctly; (2) ensure jailers comply with policy; and (3) ensure jailers receive training. (Ex. 3, pp. 25:21-25; 26:1 - 27:17)

10

43.     Christian did nothing to determine if Toombs was even performing items A through O listed as part of her job description, and he did nothing to ensure that Toombs was familiar with policy. (Ex. 3, pp. 33:11 - 34:25; Ex. 24, Job Duties for Jail Admin.)

44.     Christian thought Toombs was doing her job based on visiting with her and asking if she was doing her job. (Ex. 3, 56:1-7)

45.     Christian doesn't know if Toombs ever received the 40 hours of specialized training in the management of the training program or training for trainers, and Christian has no recollection of doing anything to ensure Toombs had the training (Ex. 3, 57:4-19; 58:17-20; Ex. 24)

46.     Christian has no recollection of Toombs ever saying people were trained on the policy and procedures, he has no recollection of any documentation showing any training provided to staff, he has no recollection of any testing on the policy and procedures, and he has no recollection of whether policy manuals were even provided to new hires. (Ex. 3, pp. 53:23 - 54:12)

47.     Christian admitted that part of his job duties is to ensure that subordinate staff are doing their jobs, but candidly admitted that he is not aware of any issues unless they are brought to his attention. (Ex. 3, pp.  55:6-25).

48.     In fact, Christian didn't even review the policy manual to make sure it was how he wanted the jail to operate. At most he "scanned over them." He never performed a comprehensive review of the policy manual and never directed anyone to perform one. (Ex. 3, pp. 35:1-13; 36:9-18)

49.     Christian recognized that following policy was important from a safety perspective, but did nothing to ensure policy was being followed, did nothing to ensure training was consistent with policy, and he admitted it was his responsibility to ensure training was happening. (Ex. 3, pp. 19;3-20; 37:3-6; 41:4-8; 47:13-17).

50.     Instead, Christian testified that handing out a policy manual was as good as training on it, and that's how it was done at the jail, even though he has no knowledge about whether policy manuals were even handed out. (Ex. 3, pp. 50:21 - 52:5; Fact No. 46)

51.     Christian admitted that failing to train staff consistent with policy could expose people to a substantial risk of serious harm, and he further acknowledged he had a duty to ensure training is consistent with policy so inmates don't suffer a worsening condition. (Ex. 3, pp.

11

41:16-21; 43:7 - 44:2)

52.     Christian admitted that an intoxicated inmate can be at risk for injury simply from their intoxication, behaviors, and potential for self-harm, and for that reason, he must provide adequate training, and Christian further admitted that not providing that training can result in a person suffering greater harm. (Ex. 3, pp. 44:11 - 46:20)

53.     Christian is also unaware of whether the Shift Supervisors were briefing subordinate staff on policy as required by their job description, and he did nothing to ensure that was happening. (Ex. 3, pp. 37:19 - 38:12; Ex. 25, Job Duties for Shift Supervisors)

54.     The only training Christian could identify prior to August 2017 was: (1) basic first aid; (2) CPR; (3) online courses; and (4) on-the-job training. Christian admitted he was unaware that the Oklahoma State Department of Health only provides testing on the Jail Standards; that agency does not provide any training. The Jail Standards are not a substitute for facility policy; they actually refer people to agency policy for specific guidance. (Ex. 3, pp. 38:18-25; 39:1-14; 50:3-20; 216:7-14; 217:6-15; Ex. 4)

55.     Christian isn't sure when training is completed for new hires, he did not know if inmates were exposed to jailers with no classroom training, he doesn't know if that might present a risk to the inmate, and he's not sure if that would be consistent with policy. (Ex. 3, pp. 39:15 - 40:17)

56.     Christian had Monday meetings with jail administration but did nothing to ensure training was happening. The Monday meetings were to discuss things that happened over the weekend. (Ex. 3, pp. 47:18 - 48:25; 49:21 - 50:2).

57.     Christian admitted it would be concerning if jailers were not training on policy because failure to read policy could expose inmates to a substantial risk of serious harm. (Ex. 3, 52:15 - 53:18)

58.     Christian never saw checklist of people who were trained. (Ex. 3, p. 53:19-22)

59.     Christian does not know how pre-service training was implemented or structured at the jail, he didn't review any documents to ensure that people received pre-service training, and he never spoke to new hires about pre-service training. (Ex. 3, pp. 60:7-9; 62:12 - 63:18; 64:9-16; 65:3-19).

60.     Despite having no substantive knowledge about training, Christian admitted that new hires needs to know policy, what it is, what it entails, and they need to know procedures, but

12

other than talking with Toombs, Christian did nothing to ensure this was happening. (Ex. 3, p. 70:4 - 71:1).

61.     Christian didn't know any of the specific learning objectives or whether new hires were trained on them, and he was unable to identify any person deposed who was actually trained on the policy manual. (Ex. 3, pp. 49:16-20; 78:12-25).

62.     Regardless, in Bryan County, as along as chain of command approves of training, Christian will back them. (Ex. 3, pp. 68:5-69:5)

63.     Christian has reviewed the Turn Key Fit for Incarceration guidelines, but he never asked Turn Key if the criteria for intoxicated people should be applied in the conjunctive or disjunctive. (Ex. 3, p. 9:18-21; 93:10 - 95:12; Ex. 19)

64.     The Fit guidelines require a medical clearance for anyone who: (1) is intoxicated to the point of not being able to answer questions correctly; (2) sit up; or (3) walk. (Ex. 19(2)).

65.     Christian is responsible for enforcing the Turn Key contract, but does nothing to ensure compliance (*Id*. at p. 114:4-11)

66.     Christian deferred all medical issues to Turn Key, including the Fit guidelines and what type of nurse is appropriate (*Id*. at pp. 115:11 - 116:9)

67.     Christian's jailers were unable to have Rebecca transported until she was cleared by Turn Key because Christian contends there was no emergency. If it's an emergency, call EMS; if not, jailers must call medical. "If medical says she needs to go to the hospital, she needs to go to the hospital." (Ex. 3, pp. 132:3-13; 135:11-16; 134:9-18)

68.     According to Christian, in "[a]ny emergency situation, the confinement officers know how to contact EMS." (Ex. 3, p. 132:14-17)

69.     Everyone is responsible for determining if an inmate has an emergent condition, but Christian was unable to identify any specific training provided to jailers that would allow them to make that determination, opting instead to generically refer to non-specific on-the-job training, the non-existent training provided by the Jail Inspection Division, and non-specific online training. (Ex. 3, p. 133:5-13)

70.     Christian admitted that Rebecca exhibited intoxicated and bizarre behavior, which both require assessment at a hospital under the facility Receiving Screening policy. (Ex. 3, pp. 150:18 - 152:10; Ex. 26, Receiving Screening form)

13

71.    Further, Christian admitted the Turn Key Fit for Incarceration Guidelines are part of facility policy and must be read in conjunction with the admission policy (Ex. 3, pp. 89:18 - 90:22)

72.    Christian admitted it would have been appropriate for jailers to seek a medical clearance for Rebecca based on the written policies; he also agreed that it is inappropriate for jailers to rely on a field assessment by EMS. (Ex. 3, pp. 156:11 - 159:3; 174:11 - 175:4).

73.    Nevertheless, Christian does not require a medical clearance for people who are so intoxicated they cannot answer questions correctly in violation of the Fit policy and the Receiving Screening policy. (Ex. 3, pp. 95:20 - 96:3; Ex. 26; Ex. 19)

74.    It is Christian's policy to admit people who are so intoxicated they cannot communicate with the booking officer, and that's exactly what happened to Rebecca. (Ex. 3, pp. 102:13 - 103:20)

75.    Christian appreciates that his admission policy can expose people like Rebecca to a substantial risk of serious harm. (Ex. 3, pp. 102:13 - 104:21)

76.    In Bryan County, accepting an intoxicated person who cannot walk without assistance is a decision made on a case-by-case basis, it is "a hard question to answer without being there and seeing it," but we would accept them without a medical clearance from the hospital (Ex. 3, pp. 86:1 - 87:8)

77.    Christian admitted that jailers performing the intake screening need specific training to make that case-by-case assessment, and if they don't have that training, they could end up booking someone who was not fit for incarceration (Ex. 3, pp. 88:1 - 89:17)

78.    Christian admitted that whether someone has a dangerous medical condition that is masked by intoxication is something that will confront a booking officer, and he further agreed that a person performing the intake medical screening needs some type of training to make the assessment. (Ex. 3, pp. 80:18 - 81:14; 97:2 - 98:8).

79.    Christian admitted the correctional environment can be dangerous for people with medical conditions who cannot walk under own power, and he further admitted that's why they can be refused admission to the jail. (Ex. 3, 81:15-24)

80.    There is no evidence Prentice received any training to make this intake medical decision for Rebecca, and Christian admitted that Rebecca's situation could be classified as "severe" under facility policy. (Ex. 3, p. 153:10-17).

14

81.     Christian authorized use of a football helmet without any consideration given to whether it might expose people to a substantial risk of serious harm. (Ex. 3, pp. 144:18 - 145:7).

82.     Christian admitted the helmet has been around a long time. (Ex. 3, pp. 140:23 - 141:3)

83.     Christian authorized its use despite (1) the lack of any written guidance governing its use; (2) a total lack of training on its use; (3) he doesn't know how long it's safe to use; (4) he doesn't know if it's designed to protect a head from a deliberate strike against concrete; (5) he did nothing to evaluate its integrity despite knowledge of its extensive time at the facility; (6) he doesn't know the risk associated with using a helmet that is not properly fitted; (7) he never sought guidance about its use; and (8) there is no guidance on what to do when its removed to determine the existence of injuries. (Ex. 3, pp.  142:15 - 143:2; 147:7-16; 163:8-10; 163:15-17; 166:17-21; 167:7-11; 167:17 - 168:9).

84.     Christian further acknowledged that jailers believed Rebecca was suicidal. (Ex. 3, p. 223:3-22).

85.     Christian admitted that head injuries can result in substantial injuries including death. (Ex. 3, p. 109:11-16)

86.     Christian admitted that if someone is hitting their head on ground, jailers should err on side of caution (Ex. 3, p. 149:10-14)

87.     Christian admitted the more appropriate thing to do is take to hospital get them checked out, let a professional medical provider clear that individual for incarceration, and then bring them back to the facility. (Ex. 3, pp. 149:20 - 150:2)

88.     Christian admitted if there's a complaint of a head injury, he "would definitely want it looked at" by a nurse or physician. (Ex. 3, pp. 106:13-16; 107:15-24; 108:7-13)

89.     After several hours, Christian agreed that Rebecca's situation was not getting better, and it was appropriate to transfer her to the hospital for evaluation by 8:00 a.m. (Ex. 3, p. 154:17-25)

90.     Despite conducting an evaluation of the incident and determining no discipline was warranted, and that everyone involved followed policy (at least as applied by Christian), Christian could offer no explanation that would justify the delay from 8:00 a.m. to 3:00 p.m. in having Rebecca transferred, and Christian further admitted that delay was not appropriate. (Ex. 3, pp. 155:16 - 156:1) (emphasis added).

15

## IV.

### ARGUMENT AND AUTHORITY

**A.    COUNTY CANNOT DEMONSTRATE ENTITLEMENT TO JUDGMENT AS A MATTER OF LAW ON THE CONDITIONS CLAIM**

**1.    CHRISTIAN MISSTATED THE LAW REGARDING UNDERLYING VIOLATIONS**

As a preliminary matter, Plaintiff is compelled to address the Tenth Circuit's standard for establishing municipal liability because Christian's motion relied on a fiction that entity liability is never available absent an underlying constitutional violation *by a jailer.* (Doc. 177, p. 29) ("The lack of a constitutional violation *by the officers* of a municipality negates a finding of liability against the municipality itself.") (emphasis added). In 1985, the Tenth Circuit rejected Christian's argument in *Garcia v. Salt Lake Cty*, 768 F.2d 303 (10th Cir. 1985), and approximately five months ago, the Tenth Circuit affirmed *Garcia* in a published opinion.

In *Crowson v. Wash. Cty. State of Utah*, 983 F.3d 1166 (10th Cir. 2020), the Tenth Circuit affirmed that an underlying constitutional violation, by a specific employee, is not required to establish municipal liability. As the Tenth Circuit recognized, "sometimes the municipal policy devolves responsibility across multiple officers. In those situations, the policies may be unconstitutional precisely because they fail to ensure that any single officer is positioned to prevent the constitutional violation. Where the sum of multiple officers' actions taken pursuant to municipal policy results in a constitutional violation, the municipality may be directly liable. That is, the municipality may not escape liability by acting through twenty hands rather than two." *Id*. at 1191.

Christian's motion argued exactly the opposite of what the Tenth Circuit requires to establish municipal liability. As *Crowson* made clear, Christian's assertion is inconsistent with Tenth Circuit precedent. Accordingly, because Section III(A) of Christian's motion relied on an improper standard, it cannot support relief under Fed. R. Civ. P. 56.

**2.    CHRISTIAN DID NOT MOVE FOR JUDGMENT BASED ON POST-INCIDENT RATIFICATION OF CONDUCT CONSISTENT WITH POLICY**

Beyond advancing an improper standard regarding the necessity of an underlying constitutional violation by an individual jailer, Christian's motion is under-inclusive of the avenues through which Rebecca may prove an unconstitutional policy or practice. (Doc. 177, pp.

16

29-31) (limiting discussion to written policies or patterns and customs based on prior tortious incidents). But Christian cannot establish entitlement to judgment as a matter of law through strawman arguments that selectively omit other avenues for proving entity liability that preclude relief under Rule 56.

One method for establishing municipal liability that Christian did not to address involves post-incident ratification of conduct as being "consistent with" existing policy or practice. *See*, *e.g.*, *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) (*citing Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (holding that, because the city policymaker failed to change policies or to discipline or reprimand officials, the jury was entitled to conclude that the complained-of practices were "accepted as the way things are done and have been done in" that city), *see also Piotrowski v. City of Houston*, 237 F.3d 567, 578 n.18 (5th Cir. 2001) (explaining that *Grandstaff* affirmed municipal liability because a policymaker's post-incident actions can ratify the prior misconduct). The Tenth Circuit has specifically recognized post-incident ratification as a method of proving entity liability where the policymaker concedes actions were consistent with policy. *See*, *e.g.*, *Hinkle v. Beckham Cty.*, 962 F.3d 1204, 1235, n.30 (10th Cir. 2020).

For example, in *J.B. v. Wash. Cty.*, 127 F.3d 919 (10th Cir. 1997), the Tenth Circuit considered a deputy's decision to remove a child from her home, and the sheriff's post-incident testimony that "he approved Deputy Humphreys's actions 'as being in accordance with [County Sheriff's Office's] policies and procedures." *Id*. at 924 (*quoting J.B. v. Wash Cty.*, 905 F.Supp. 979, 985, n.7 (D. Utah 1995)). Because the sheriff acknowledged that the deputy's decision to remove the child was consistent with policy, the Tenth Circuit held the conduct was fairly attributable to the municipal entity. The same is true here.

Christian testified that all conduct here was consistent with the official policies and practices of Bryan County. Accordingly, because Christian formally conceded the conduct in question was consistent with policy, a jury may infer that Christian's policy was the moving force behind any violation. *See*, *e.g.*, *Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1279-1280 (10th Cir. 2009) ("If it turns out that the relevant ordinances are unconstitutional, whether on their face or as applied [], the liability falls on the city . . . [municipal entities] may be subject to liability under § 1983" if they "make[] and enforce[] a law that is unconstitutional as applied.")

17

It is immaterial whether Plaintiff can identify a written policy or a pattern of prior tortious incidents: like the sheriff in *J.B.*, Christian endorsed the jailers' conduct as being consistent with county policy, and pursuant to precedent from the Tenth Circuit, it does not matter whether the policy is unconstitutional on its face or as applied, a deprivation occasioned by conduct consistent with policy will support municipal liability. While a plaintiff may establish municipal liability through other methods, including a pattern of tortious incidents, there is no requirement that she do so. Because Christian did not address post-incident ratification, and instead based the motion on an immaterial contention regarding prior tortious incidents, Christian's argument is under-inclusive and cannot support the relief requested.

### 3.   CHRISTIAN DID NOT MOVE FOR JUDGMENT ON THE CUMULATIVE IMPACT OF JAIL CONDITIONS

"Corrections officials have the responsibility under the Eighth Amendment, and therefore the Fourteenth Amendment, 'to provide humane conditions of confinement by ensuring inmates receive the basic necessities of . . . medical care and [] taking reasonable measures to guarantee the inmates' safety.'" *Allen v. Avance*, 491 F.App'x 1, 4 (10th Cir. 2012) (*quoting Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998)). Critically, when evaluating the impact of jail conditions, "[i]t is important to recognize that various deficiencies in prison conditions 'must be considered together.'" *Rhodes v. Chapman*, 452 U.S. 337, 362-63 (1981) (*quoting Holt v. Sarver*, 309 F.Supp. 362, 373 (E.D.Ark.1970)). The individual conditions "exist in combination; each affects the other; and taken together they [may] have a cumulative impact on the inmates." *Id.*

Rebecca identified several jail conditions that implicate the cumulative effect of conditions of confinement at the BCDC including: (1) failing to train jail staff on Turn Key medical policies that govern fitness for detention; (2) failing to require any hands-on assessment or vital sign monitoring of at-risk people that staff admitted without an assessment; (3) failing to have any written guidance on use of restraint devices; (4) failing to train staff on the proper use of restraint devices; (4) authorizing the use of restraint devices that have the safety features completely removed; (5) failure to train staff to medically assess at-risk people following the untrained use of unsafe restraint devices; and (6) a failure to adopt adequate procedures for the prompt assessment and transport of at-risk people for higher-level care.

Christian's motion never addressed cumulative impact. Instead, Christian addressed some conditions in a vacuum despite the Supreme Court's admonition that "[i]t is important to

18

recognize that various deficiencies in prison conditions 'must be considered together.'" *Rhodes*, *supra*. By failing to address the cumulative impact of jail conditions, Christian, in his official capacity, has not carried its burden to show the county is entitled to judgment as a matter of law on the conditions claim. Under Tenth Circuit precedent, Plaintiff is not required to address arguments that Christian could have raised, but didn't. *See Oldham v. O.K. Farms, Inc.,* 871 F.3d 1147, 1151 (10th Cir. 2017) (*quoting Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir. 1989) ("When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B—a ground the movant might have presented but did not."); *see also Bonilla v. Nazario*, 843 F.2d 34, 37 (1st Cir. 1988); *John Deere Co. v. American National Bank*, 809 F.2d 1190, 1192 (5th Cir. 1987).

Based on the foregoing, Plaintiff respectfully requests the Court deny the motion as it relates to Claim 1 asserting unlawful conditions of confinement against Christian in his official capacity.

### B.   COUNTY'S LACK OF TRAINING EXHIBITED DELIBERATE INDIFFERENCE

To recover on a failure to train claim, the plaintiff must provide evidence on three elements: "1. the existence of a county policy or custom involving deficient training; 2. the policy or custom's causation of an injury; [and] 3. the county's adoption of a policy or custom with deliberate indifference." *Lance v. Morris*, 985 F.3d 787, 800 (10th Cir. 2021).

#### 1.   INTAKE PROCESS

First, Christian had a policy or custom of deficient training on the intake process while the facility was operating without on-site medical care. During those times, Christian knew to a moral certainty that staff would make booking decisions about "highly" intoxicated people who are incoherent and whether their condition was an emergency. Despite this knowledge, Christian provided no training on how to determine the immediacy of the medical issues confronting the booking officer. (Ex. 20, pp. 26:15-19; 29:19 - 33:12). Christian acknowledged his intake practice exposed people like Rebecca to a substantial risk of serious harm. This same training deficiency was held actionable in *Lance*, *supra*.

Second, there is evidence Christian's policy caused Plaintiff's injury because her level of intoxication and incoherence were not suitable for pretrial detention where she subsequently sustained a brain injury. Rebecca required a medical clearance to determine the underlying cause

of her condition, and whether pretrial detention would increase the risk of harm to her, but the county's inadequate training exposed her to a substantial risk of serious harm by accepting her for detention anyway.

Third, as stated above, Christian admitted the intake procedure exposed people like Rebecca to a substantial risk of serious harm, and despite that knowledge, Christian took no reasonable steps to address the deficiency. Because Christian agreed that his practice exposed people to a substantial risk of serious harm, Plaintiff respectfully submits that nothing more is required to establish an inference of deliberate indifference.

### 2.   USE OF FORCE

Christian also had a policy or custom of deficient training for use of the facility football helmet and hog-tie techniques. As before, Christian knew to a moral certainty that he provided jailers with the football helmet and hog-tie restraints with the intent that jailers use the devices on people like Rebecca, but he provided no associated training whatsoever, choosing instead to allow the state of nature to govern when and how those devices were used on a vulnerable population.

Second, Christian's policy of deficient training caused jailers to use the helmet under circumstances that were objectively unreasonable, including: (1) improvisation: resorting to the helmet, not because it was appropriate for the circumstances, but because the appropriate devices were broken; (2) dangerous use: permitting ongoing and repeated use without any medical clearance or inspections following the complete removal of the device's safety cushioning; and (3) unreasonable response: use of a football helmet did nothing to address the risk from an existing head injury, and the video depicts Rebecca's struggles increasing once she was in full restraints.

Third, Christian's decision to allow untrained use of the helmet satisfies the three factor obviousness test adopted in *Lance*: (1) Christian knew to a moral certainty that jailers would use the device on people like Rebecca; (2) the issues of how and when to use restraint devices on people with head injuries, who are also incoherent and "highly" intoxicated, presents jailers with a difficult choice of the sort that training or supervision will make less difficult, including: (a) training to understand when critical safety features are missing that render use of the device dangerous; (b) training to understand predictable risks associated with using the device based on a person's current medical condition; and (c) training to adequately assess the person for injuries

20

once the restraint is removed; and (3) the wrong choice will frequently cause the deprivation of a constitutional right because it will likely result in a use of force that is objectively unreasonable.

### 3.   HOSPITAL TRANSPORT

Christian had a policy that diffused responsibility for transporting at-risk people to the hospital across numerous individuals without any clear guidance that would result in a prompt transport. For example, Johnson needed permission from Toombs. Prentice testified that a shift supervisor like Johnson had authority on his own. Christian testified that responsibility rested with Turn Key, while Turn Key claimed it had no authority to authorize transport.

Second, Christian's haphazard transport policy caused a delay because (1) the people allegedly responsible for transport were unaware they had that responsibility; and (2) Johnson knew Rebecca needed transport at 8:00 a.m., but was unable to actually transport until 3:00 p.m., a delay of approximately seven hours; and (3) Christian openly admitted the delay was unacceptable and exposed Rebecca to an additional seven hours of languishing in considerable pain on the cell floor.

Third, the record supports the inference that a constitutional deprivation was a highly predictable or plainly obvious consequence of a transport policy that does not provide clear guidance for connecting an at-risk person with outside medical care. For example: (1) based on the realities of pretrial detention, Christian knew to a moral certainty that jailers would be called upon to have at-risk inmates transported for outside care; (2) how and when to transport for outside care is the type of decision that training or supervision will make less difficult by clearly identifying a process and responsibility for transport; and (3) the wrong choice will frequently cause the deprivation of a constitutional right because it will likely result in a delay of medical care for an at-risk person that can predictably result in substantial harm, like considerable pain, permanent injury, or death.

The record supports the inference that multiple training deficiencies existed at the jail that are closely related to Rebecca's injury. Nevertheless, Christian argued the county was not indifferent because (1) Christian put Toombs in charge of training; (2) Christian occasionally met with Toombs and jailers; and (3) jailers received training on topics unrelated to the deficiencies. (Doc. 177, p. 33). None of these responses have merit.

First, inadequate training is a species of entity liability that does not turn on the person responsible for the training, but the question is immaterial: Christian admitted he never delegated

policymaking authority to Toombs. Second, whether Christian occasionally met with Toombs and other jailers is immaterial because there is no assertion those meetings addressed the relevant training deficiencies. Finally, the same is true regarding the other training Christian identified: none of the items respond to the specific training deficiencies at issue. Again, the issue is not whether any training was provided, but whether the county exhibited deliberate indifference *to a specific training deficiency*. County did not address this question, and therefore cannot prevail under Rule 56.

### C.   COUNTY DID NOT ADDRESS THE CLAIM FOR INADEQUATE SUPERVISION

In *Lopez v. LeMaster*, 172 F.3d 756 (10th Cir. 1999), the Tenth Circuit explicitly recognized a claim for inadequate supervision under § 1983 where a sheriff told investigators about surveillance deficiencies at the jail. *Id.* at 762 ("This admission provides evidence that Sheriff LeMaster was aware of the risk of harm to inmates resulting from inadequate supervision, and failed to take reasonable measures to prevent it.")

Rather than address Rebecca's claim for inadequate supervision (Claim 3), Christian recharacterized the claim into one for "deliberate indifference to [] medical needs and safety." (Doc. 177, p. 27). A claim for inadequate supervision is not synonymous with a claim for deliberate indifference to "medical needs and safety." As set forth in the Second Amended Complaint, Claim 3 alleged an unlawful policy or custom of "inadequate supervision" (Doc. 63, pp. 23-24). Christian cannot prevail under Rule 56 by recharacterizing Rebecca's claim and then moving for judgment on a claim she never asserted. Again, Rebecca is not required to address arguments that Christian could have raised, but didn't. *See Oldham,* 871 F.3d at 1151.

Even so, Christian's contentions regarding Claim 3 are fatally underdeveloped and cannot support entitlement to judgment as a matter of law. Again, Christian limited the motion to (1) the absence of a written policy; and (2) the absence of a longstanding practice. (Doc. 177, pp. 27-35). However, Christian cannot prevail under Rule 56 by ignoring the concession that all conduct was consistent with county policy, which eliminates the need to come forward with more or different evidence of a longstanding practice. Accordingly, whether Plaintiff has adduced a pattern of tortious incidents is irrelevant because the Christian confession provides a sufficient evidentiary predicate to establish the very practice that prior incidents are intended reveal. Based on the foregoing, Plaintiff respectfully requests the Court deny the motion as it relates to Claim 3 asserting inadequate supervision against Christian in his official capacity.

## V.

### CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests the Court deny the motion and enter such other relief as a the Court deems just and equitable.

**WHEREFORE**, Plaintiff respectfully requests the Court grant the motion and enter any such other relief as the Court deems just and equitable.

Respectfully submitted,

BRYAN & TERRILL

By: *s/J. Spencer Bryan*
   Steven J. Terrill, OBA # 20869
   J. Spencer Bryan, OBA # 19419
   BRYAN & TERRILL LAW, PLLC
   3015 E. Skelly Dr., Suite 400
   Tulsa, OK 74105
   Tele/Fax: (918) 935-2777
   Email: sjterrill@bryanterrill.com
   Email: jsbryan@bryanterrill.com

23